**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 14-1845**

LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA; A. PHILIP
RANDOLPH INSTITUTE; UNIFOUR ONESTOP COLLABORATIVE; COMMON
CAUSE NORTH CAROLINA; GOLDIE WELLS; KAY BRANDON; OCTAVIA
RAINEY; SARA STOHLER; HUGH STOHLER,

    Plaintiffs,

  and

LOUIS M. DUKE; CHARLES M. GRAY; ASGOD BARRANTES; JOSUE E.
BERDUO; BRIAN M. MILLER; NANCY J. LUND; BECKY HURLEY MOCK;
MARY-WREN RITCHIE; LYNNE M. WALTER; EBONY N. WEST,

    Intervenors/Plaintiffs – Appellants,

    v.

STATE OF NORTH CAROLINA; JOSHUA B. HOWARD, in his official
capacity as a member of the State Board of Elections; RHONDA
K. AMOROSO, in her official capacity as a member of the
State Board of Elections; JOSHUA D. MALCOLM, in his official
capacity as a member of the State Board of Elections; PAUL
J. FOLEY, in his official capacity as a member of the State
Board of Elections; MAJA KRICKER, in her official capacity
as a member of the State Board of Elections; PATRICK L.
MCCRORY, in his official capacity as Governor of the state
of North Carolina,

    Defendants – Appellees.

--------------------------------------

UNITED STATES OF AMERICA,

    Amicus Curiae,

BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW,

Amicus Supporting Appellants,

JUDICIAL WATCH, INCORPORATED; ALLIED EDUCATIONAL FOUNDATION; CHRISTINA KELLEY GALLEGOS-MERRILL,

Amici Supporting Appellees.

---

**No. 14-1856**

---

NORTH CAROLINA STATE CONFERENCE OF BRANCHES OF THE NAACP; ROSANELL EATON; EMMANUEL BAPTIST CHURCH; BETHEL A. BAPTIST CHURCH; COVENANT PRESBYTERIAN CHURCH; CLINTON TABERNACLE AME ZION CHURCH; BARBEE'S CHAPEL MISSIONARY BAPTIST CHURCH, INC.; ARMENTA EATON; CAROLYN COLEMAN; JOCELYN FERGUSON-KELLY; FAITH JACKSON; MARY PERRY; MARIA TERESA UNGER PALMER,

Plaintiffs – Appellants,

and

NEW OXLEY HILL BAPTIST CHURCH; BAHEEYAH MADANY; JOHN DOE 1; JANE DOE 1; JOHN DOE 2; JANE DOE 2; JOHN DOE 3; JANE DOE 3,

Plaintiffs,

v.

PATRICK L. MCCRORY, in his official capacity as Governor of the state of North Carolina; JOSHUA B. HOWARD, in his official capacity as a member of the State Board of Elections; RHONDA K. AMOROSO, in her official capacity as a member of the State Board of Elections; JOSHUA D. MALCOLM, in his official capacity as a member of the State Board of Elections; PAUL J. FOLEY, in his official capacity as a member of the State Board of Elections; MAJA KRICKER, in her official capacity as a member of the State Board of Elections,

Defendants – Appellees.

------------------------------------

UNITED STATES OF AMERICA,

Amicus Curiae,

BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW,

Amicus Supporting Appellants,

JUDICIAL WATCH, INCORPORATED; ALLIED EDUCATIONAL FOUNDATION; CHRISTINA KELLEY GALLEGOS-MERRILL,

Amici Supporting Appellees.

------------------------

**No. 14-1859**

------------------------

LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA; A. PHILIP RANDOLPH INSTITUTE; UNIFOUR ONESTOP COLLABORATIVE; COMMON CAUSE NORTH CAROLINA; GOLDIE WELLS; OCTAVIA RAINEY; HUGH STOHLER; KAY BRANDON; SARA STOHLER,

Plaintiffs – Appellants,

and

LOUIS M. DUKE; CHARLES M. GRAY; ASGOD BARRANTES; JOSUE E. BERDUO; BRIAN M. MILLER; NANCY J. LUND; BECKY HURLEY MOCK; MARY-WREN RITCHIE; LYNNE M. WALTER; EBONY N. WEST,

Intervenors/Plaintiffs,

v.

STATE OF NORTH CAROLINA; JOSHUA B. HOWARD, in his official capacity as a member of the State Board of Elections; RHONDA K. AMOROSO, in her official capacity as a member of the State Board of Elections; JOSHUA D. MALCOLM, in his official capacity as a member of the State Board of Elections; PAUL J. FOLEY, in his official capacity as a member of the State Board of Elections; MAJA KRICKER, in her official capacity as a member of the State Board of Elections; PATRICK L.

3

MCCRORY, in his official capacity as Governor of the state of North Carolina,

Defendants – Appellees.

------------------------------------

UNITED STATES OF AMERICA,

Amicus Curiae,

BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW,

Amicus Supporting Appellants,

JUDICIAL WATCH, INCORPORATED; ALLIED EDUCATIONAL FOUNDATION; CHRISTINA KELLEY GALLEGOS-MERRILL,

Amici Supporting Appellees.

---

Appeals from the United States District Court for the Middle District of North Carolina, at Greensboro. Thomas D. Schroeder, District Judge. (1:13-cv-00658-TDS-JEP; 1:13-cv-00861-TDS-JEP; 1:13-cv-00660-TDS-JEP)

---

Argued: September 25, 2014       Decided: October 1, 2014

---

Before MOTZ, WYNN, and FLOYD, Circuit Judges.

---

Reversed in part, affirmed in part, and remanded with instructions by published opinion. Judge Wynn wrote the majority opinion, in which Judge Floyd joined. Judge Motz wrote a dissenting opinion.

---

**ARGUED:** Allison Jean Riggs, SOUTHERN COALITION FOR SOCIAL JUSTICE, Durham, North Carolina; Penda Denise Hair, ADVANCEMENT PROJECT, Washington, D.C.; Marc Erik Elias, PERKINS COIE LLP, Washington, D.C., for Appellants. Alexander McClure Peters, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina; Thomas A. Farr, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., Raleigh, North Carolina, for Appellees. Holly Aiyisha Thomas,

UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus United States of America. **ON BRIEF:** Anita S. Earls, George E. Eppsteiner, SOUTHERN COALITION FOR SOCIAL JUSTICE, Durham, North Carolina; Dale Ho, Julie A. Ebenstein, Sean Young, New York, New York, Laughlin McDonald, ACLU VOTING RIGHTS PROJECT, Atlanta, Georgia; Christopher Brook, ACLU OF NORTH CAROLINA LEGAL FOUNDATION, Raleigh, North Carolina, for Appellant League of Women Voters of North Carolina. Elisabeth C. Frost, Washington, D.C., Joshua L. Kaul, PERKINS COIE LLP, Madison, Wisconsin; Edwin M. Speas, Jr., John W. O'Hale, Caroline P. Mackie, POYNER SPRUILL LLP, Raleigh, North Carolina, for Appellant Louis M. Duke. Edward A. Hailes, Jr., Denise D. Lieberman, Donita Judge, Caitlin Swain, ADVANCEMENT PROJECT, Washington, D.C.; Irving Joyner, Cary, North Carolina; Adam Stein, TIN FULTON WALKER & OWEN, PLLC, Chapel Hill, North Carolina; Daniel T. Donovan, Susan M. Davies, Bridget K. O'Connor, K. Winn Allen, Kim Knudson, Jodi Wu, KIRKLAND & ELLIS LLP, Washington, D.C., for Appellant North Carolina State Conference of Branches of the NAACP. Robert C. Stephens, OFFICE OF THE GOVERNOR OF NORTH CAROLINA, Raleigh, North Carolina; Karl S. Bowers, Jr., BOWERS LAW OFFICE LLC, Columbia, South Carolina, for Appellee Governor Patrick L. McCrory. Katherine A. Murphy, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina; Phillip J. Strach, Michael D. McKnight, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., Raleigh, North Carolina, for Appellees State of North Carolina and North Carolina State Board of Election. Molly J. Moran, Acting Assistant Attorney General, Diana K. Flynn, Civil Rights Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Ripley Rand, United States Attorney, Greensboro, North Carolina, Gill P. Beck, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Amicus United States of America. Samuel Brooke, SOUTHERN POVERTY LAW CENTER, Montgomery, Alabama; Michael C. Li, Jennifer L. Clark, Tomas Lopez, THE BRENNAN CENTER FOR JUSTICE AT N.Y.U. SCHOOL OF LAW, New York, New York, for Amicus The Brennan Center for Justice at N.Y.U School of Law. Chris Fedeli, JUDICIAL WATCH, INC., Washington, D.C.; H. Christopher Coates, LAW OFFICE OF H. CHRISTOPHER COATES, Charleston, South Carolina; Bradley J. Schlozman, HINKLE LAW FIRM LLC, Wichita, Kansas; Gene B. Johnson, JOHNSON LAW FIRM, P.A., Arden, North Carolina, for Amici Judicial Watch, Incorporated, Allied Educational Foundation, and Christina Kelley Gallegos-Merrill.

---

5

WYNN, Circuit Judge:

The right to vote is fundamental. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." Wesberry v. Sanders, 376 U.S. 1, 17 (1964). And a tight timeframe before an election does not diminish that right.

"In decision after decision, [the Supreme] Court has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." Dunn v. Blumstein, 405 U.S. 330, 336 (1972). Congress sought to further ensure equal access to the ballot box by passing the Voting Rights Act, which was aimed at preventing "an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." Thornburg v. Gingles, 478 U.S. 30, 47 (1986).

On June 25, 2013, the Supreme Court lifted certain Voting Rights Act restrictions that had long prevented jurisdictions like North Carolina from passing laws that would deny minorities equal access. See Shelby Cnty., Ala. v. Holder, 133 S. Ct. 2612 (2013). The very next day, North Carolina began pursuing sweeping voting reform—House Bill 589—which is at the heart of this appeal.

With House Bill 589, North Carolina imposed strict voter identification requirements, cut a week off of early voting, prohibited local election boards from keeping the polls open on the final Saturday afternoon before elections, eliminated same-day voter registration, opened up precincts to "challengers," eliminated pre-registration of sixteen- and seventeen-year-olds in high schools, and barred votes cast in the wrong precinct from being counted at all.

In response, various Plaintiffs and the United States Government sued North Carolina, alleging that House Bill 589 violates equal protection provisions of the United States Constitution as well as the Voting Rights Act. Plaintiffs sought to prevent House Bill 589 from taking effect by asking the district court for a preliminary injunction. Such an injunction would maintain the status quo to prevent irreparable harm while the lawsuit plays itself out in the courts.

But the district court refused. In so doing, the district court laid out what it believed to be the applicable law. Notably, however, the district court got the law plainly wrong in several crucial respects. When the applicable law is properly understood and applied to the facts as the district court portrayed them, it becomes clear that the district court abused its discretion in denying Plaintiffs a preliminary injunction and not preventing certain provisions of House Bill

7

589 from taking effect while the parties fight over the bill's legality. Accordingly, we reverse the district court's denial of the preliminary injunction as to House Bill 589's elimination of same-day registration and prohibition on counting out-of-precinct ballots.

However, we affirm the district court's denial of Plaintiffs' request for a preliminary injunction with respect to the following House Bill 589 provisions: (i) the reduction of early-voting days; (ii) the expansion of allowable voter challengers; (iii) the elimination of the discretion of county boards of elections to keep the polls open an additional hour on Election Day in "extraordinary circumstances"; (iv) the elimination of pre-registration of sixteen- and seventeen-year-olds who will not be eighteen years old by the next general election; and (v) the soft roll-out of voter identification requirements to go into effect in 2016. With respect to these provisions, we conclude that, although Plaintiffs may ultimately succeed at trial, they have not met their burden of satisfying all elements necessary for a preliminary injunction. We therefore affirm in part, reverse in part, and remand to the district court with specific instructions to enter, as soon as

possible, an order granting a preliminary injunction enjoining enforcement of certain provisions of House Bill 589.[1]

## I.  <u>Background</u>[2]

In spring 2013, the North Carolina General Assembly began working on a voter identification law.  The House Committee on Elections, chaired by Representative David R. Lewis, held public hearings, and an initial version of House Bill 589 was introduced in the House on April 4.  In April, House Bill 589 was debated, amended, and advanced; it ultimately passed the House essentially along party lines, with no support from any African American representatives.

In March 2013, before the bill was introduced to the house, the various sponsors of House Bill 589 sent an e-mail to the

---

[1] While the separate opinion is styled as a dissent, it concurs with the majority opinion in affirming the district court's decision to deny an injunction as to multiple House Bill 589 provisions. We agree with a number of the concerns the separate opinion raises as to all but two of the challenged provisions—the elimination of same-day registration and out-of-precinct voting.

[2] As an appellate court, we neither re-weigh evidence nor make factual findings.  And though we may, in this procedural posture, call out clear error if the district court "ma[de] findings without properly taking into account substantial evidence to the contrary[,]" <u>United States v. Caporale</u>, 701 F.3d 128, 140 (4th Cir. 2012), we are taking the facts as they have been depicted by the district court in <u>North Carolina State Conference of Branches of the NAACP v. McCrory</u>, 997 F. Supp. 2d 322 (M.D.N.C. 2014).

State Board of Elections asking for a "cross matching of the registered voters in [North Carolina] with the [DMV] to determine a list of voters who have neither a [North Carolina] Driver's License nor a [North Carolina] Identification Card." Id. at 357. The legislators also wanted "that subset broken down into different categories within each county by all possible demographics that [the State Board of Elections] typically captures (party affiliation, ethnicity, age, gender, etc.)." McCrory, 997 F. Supp. 2d at 357. The State Board of Elections sent the data in a large spreadsheet the next day.

Later in March 2013, Representative Lewis sent a ten-page letter to State Board of Elections Director Gary Bartlett asking about the State Board of Elections' conclusion that 612,955 registered voters lacked a qualifying photo identification. He asked the State Board of Elections to "provide the age and racial breakdown for voters who do not have a driver's license number listed." Id. In April, Bartlett sent a nineteen-page response along with a spreadsheet that included the requested race data. That same day, Speaker of the House Thom Tillis's general counsel e-mailed the State Board of Elections, asking for additional race data on people who requested absentee ballots in 2012; that data, too, the State Board of Elections provided.

10

In late April 2013, House Bill 589 made its way to the North Carolina Senate, passed first reading, and was assigned to the Senate Rules Committee. That committee took no action on the bill for three months, until July 23. "The parties do not dispute that the Senate believed at this stage that [House Bill] 589 would have to be submitted to the United States Department of Justice . . . for 'pre-clearance' under Section 5 of the [Voting Rights Act], 42 U.S.C. § 1973c(a), because many North Carolina counties were 'covered jurisdictions' under that Section. However, at that time the United States Supreme Court was considering a challenge to the . . . ability to enforce Section 5." McCrory, 997 F. Supp. 2d at 336.[3]

On June 25, the Supreme Court issued its decision in Shelby County, declaring the formula used to determine the Section 5 covered jurisdictions unconstitutional. The very next day, Senator Thomas Apodaca, Chairman of the North Carolina Senate Rules Committee, publicly stated, "So, now we can go with the full bill." Id. at 336. The contents of the "full bill" were not disclosed at the time.

---

[3] Under Section 5's preclearance requirement, no change in voting procedures in covered jurisdictions could take effect until approved by federal authorities. A jurisdiction could obtain such preclearance only by proving that the change had neither "the purpose [nor] the effect of denying or abridging the right to vote on account of race or color." 52 U.S.C. § 10304(a).

A meeting of the Rules Committee was subsequently scheduled for July 23. The night before the Rules Committee meeting, the new bill, by then fifty-seven pages in length, was posted for the members on the Rules Committee website. Unlike the original bill, which focused mainly on voter identification, the amended House Bill 589 expanded the list of restrictive provisions to include (1) the reduction of early-voting days; (2) the elimination of same-day registration; (3) a prohibition on counting out-of-precinct ballots; (4) an expansion of allowable poll observers and voter challenges; (5) the elimination of the discretion of county boards of elections to keep the polls open an additional hour on Election Day in extraordinary circumstances; and (6) the elimination of pre-registration of sixteen- and seventeen-year-olds who will not be eighteen years old by the next general election.

After debate on July 23, the amended bill passed the committee and proceeded to the floor. On July 25, the Senate began its session with the third reading of the substantially amended House Bill 589. Proponents and opponents of the bill debated its provisions and various proposed amendments for four hours. "Several Senators characterized the bill as voter suppression of minorities." McCrory, 997 F. Supp. 2d at 337. Nevertheless, at the close of debate, a party-line vote sent House Bill 589, as amended, back to the House for concurrence.

That same day, after the bill had been modified and passed by the Senate, a State Board of Elections employee e-mailed data to Representative Lewis, one of the bill's House sponsors. The data contained verification rates for same-day registration in the 2010 and 2012 elections and information about the type of identifications presented by same-day registrants.

On the evening of July 25, the House received the Senate's version of House Bill 589. During debate, opponents characterized the measure "variously as voter suppression, partisan, and disproportionately affecting" African Americans, young voters, and the elderly. McCrory, 997 F. Supp. 2d at 337. At 10:39 p.m. that night, the House voted–again along party lines–to concur in the Senate's version of House Bill 589.

The bill was ratified the next day, July 26, and presented to Governor Patrick McCrory on July 29. The Governor signed House Bill 589 into law on August 12, 2013.

That very same day, Plaintiffs filed lawsuits challenging certain House Bill 589 provisions in the federal district court for the Middle District of North Carolina. Plaintiffs alleged that the challenged provisions violated both the United States Constitution and the Voting Rights Act. Soon thereafter, in September 2013, the United States filed a lawsuit challenging certain House Bill 589 provisions exclusively under the Voting

13

Rights Act.  And finally, a group of young voters intervened, also asserting constitutional claims.

The lawsuits were consolidated, the parties undertook discovery, and Plaintiffs moved for a preliminary injunction. House Bill 589 contains numerous provisions, only some of which Plaintiffs challenge.  Specifically, Plaintiffs challenge the legality of, and asked the court to enjoin: the elimination of same-day voter registration; the elimination of out-of-precinct voting; the reduction of early-voting days; an increase in at-large observers at the polls and the deputizing of any resident to challenge ballots at the polls; the elimination of the discretion of county boards of elections to extend poll hours under extraordinary circumstances; and the soft roll-out of voter identification requirements to go into effect in 2016.

A. Same-Day Registration

In 2007, the General Assembly passed legislation permitting same-day registration at early-voting sites.  The law provided that "an individual who is qualified to register to vote may register in person and then vote at [an early-voting] site in the person's county of residence during the period for [early] voting provided under [Section] 163-227.2."  2007 N.C. Sess. Laws 253, § 1 (codified at N.C. Gen. Stat. § 163-82.6A(a) (2008)).  The law required a prospective voter to complete a

14

voter-registration form and produce a document to prove his or her current name and address. Id. (codified at N.C. Gen. Stat. § 163-82.6A(b) (2008)).

If the registrant wanted to vote immediately, he or she could "vote a retrievable absentee ballot as provided in [Section] 163-227.2 immediately after registering." Id. (codified at N.C. Gen. Stat. § 163-82.6A(c) (2008)). Within two business days, both the pertinent county board of elections and the State Board of Elections were required to verify the voter's driver's license or social security number, update the database, proceed to verify the voter's proper address, and count the vote unless it was determined that the voter was not qualified to vote. Id. (codified at N.C. Gen. Stat. § 163-82.6A(d) (2008)).

House Bill 589 eliminated same-day registration. A voter's registration must now be postmarked at least twenty-five days before Election Day or, if delivered in person or via fax or scanned document, received by the county board of elections at a time established by the board. N.C. Gen. Stat. § 163-82.6(c)(1)-(2).

Plaintiffs' expert presented unrebutted testimony that African American North Carolinians have used same-day registration at a higher rate than whites in the three federal elections during which it was offered. Specifically, in 2012, 13.4% of African American voters who voted early used same-day

15

registration, as compared to 7.2% of white voters; in the 2010 midterm, the figures were 10.2% and 5.4%, respectively; and in 2008, 13.1% and 8.9%. The district court therefore concluded that the elimination of same-day registration would "bear more heavily on African-Americans than whites." McCrory, 997 F. Supp. 2d at 355.

B. Out-of-Precinct Voting

In 2002, Congress passed the Help America Vote Act, 42 U.S.C. §§ 15301-15545. Under the Help America Vote Act, states are required to offer provisional ballots to Election Day voters who changed residences within thirty days of an election but failed to report the move to their county board of elections. See 42 U.S.C. § 15482(a). However, such provisional ballots are only required to be counted "in accordance with State law." Id. § 15482(a)(4).

In response, the North Carolina General Assembly passed Session Law 2005-2, removing the requirement that voters appear in the proper precinct on Election Day in order to vote. 2005 N.C. Sess. Law 2, § 2 (codified at N.C. Gen. Stat. § 163-55(a) (2006)). The law provided that "[t]he county board of elections shall count [out-of-precinct provisional ballots] for all ballot items on which it determines that the individual was eligible

16

under State or federal law to vote." Id. § 4 (codified at N.C. Gen. Stat. § 163-166.11(5) (2006)).

The General Assembly made a finding when it adopted the mechanism in SL 2005-2 that "'of those registered voters who happened to vote provisional ballots outside their resident precincts on the day of the November 2004 General Election, a disproportionately high percentage were African-American.'" McCrory, 997 F. Supp. 2d at 368 (citation omitted).

The district court found that (1) between the years 2006 and 2010, an average of 17.1% of African Americans in North Carolina moved within the State, as compared to only 10.9% of whites; and (2) 27% of poor African Americans in North Carolina lack access to a vehicle, compared to 8.8% of poor whites. Also, the court accepted the determinations of Plaintiffs' experts that "the prohibition on counting out-of-precinct provisional ballots will disproportionately affect black voters." Id. at 366. According to calculations the district court accepted, the total number of African Americans using out-of-precinct voting represents 0.342% of the African American vote in that election. The total share of the overall white vote that voted out-of-precinct was 0.21%. Id. House Bill 589 bars county boards of elections from counting such ballots.

C. <u>Early Voting</u>

"No-excuse" early voting was established for even-year general elections in North Carolina beginning in 2000. 1999 N.C. Sess. Law 455, § 1 (codified at N.C. Gen. Stat. §§ 163-226(a1), 163-227.2(a1) (2000)). At that point, a registered voter could present herself at her county board of elections office "[n]ot earlier than the first business day after the twenty-fifth day before an election . . . and not later than 5:00 p.m. on the Friday prior to that election" to cast her ballot. N.C. Gen. Stat. § 163-227.2(b) (2000).

After the 2000 election cycle, the General Assembly expanded no-excuse early voting to all elections. 2001 N.C. Sess. Law 337, § 1. It also amended the early-voting period so that voters could appear at the county board of elections office to vote "[n]ot earlier than the third Thursday before an election . . . and not later than 1:00 P.M. on the last Saturday before that election." 2001 N.C. Sess. Law 319, § 5(a) (codified at N.C. Gen. Stat. § 163-227.2(b) (2002)). Under this law, county boards of elections were required to remain open for voting until 1:00 p.m. on that final Saturday, but retained the discretion to allow voting until 5:00 p.m. <u>Id.</u> They were also permitted to maintain early-voting hours during the evening or on weekends throughout the early-voting period. <u>Id.</u> § 5(b) (codified at N.C. Gen. Stat. § 163-227.2(f) (2002)).

18

House Bill 589 changes the law to allow only ten days of early voting.  It also eliminates the discretion county boards of elections had to stay open until 5:00 p.m. on the final Saturday of early voting.

The district court found that in 2010, 36% of all African American voters that cast ballots utilized early voting, as compared to 33.1% of white voters.  By comparison, in the presidential elections of 2008 and 2012, over 70% of African American voters used early voting compared to just over 50% of white voters.

### D. Poll Observers and Challengers

North Carolina law permits the chair of each political party in every county to "designate two observers to attend each voting place at each primary and election."  N.C. Gen. Stat. § 163-45(a).  House Bill 589 allows the chair of each county party to "designate 10 additional at-large observers who are residents of that county who may attend any voting place in that county." 2013 N.C. Sess. Law 381, § 11.1 (codified at N.C. Gen. Stat. § 163-45(a)).  "Not more than two observers from the same political party shall be permitted in the voting enclosure at any time, except that in addition one of the at-large observers from each party may also be in the voting enclosure." Id.  The list of at-large observers must be "provided by the county

19

director of elections to the chief judge [for each affected precinct]."  Id. (codified at § 163-45(b)).

In conjunction with the addition of at-large observers, the law now permits any registered voter in the county to challenge a ballot on Election Day.  Id. § 20.2 (codified at N.C. Gen. Stat. § 163-87)).  And during early voting, any state resident may now challenge ballots.  Id. § 20.1 (codified at N.C. Gen. Stat. § 163-84)).

### E. County Boards of Elections Discretion to Keep the Polls Open

Under North Carolina law, the polls on Election Day are to remain open from 6:30 a.m. until 7:30 p.m.  N.C. Gen. Stat. § 163-166.01.  Beginning in 2001, each county board of elections had the power to "direct that the polls remain open until 8:30 p.m." in "extraordinary circumstances."  2001 N.C. Sess. Laws 460, § 3 (codified at N.C. Gen. Stat. § 163-166 (2002)).  House Bill 589 eliminates the discretion of the county boards of elections by deleting the "extraordinary circumstances" clause. 2013 N.C. Sess. Law 381, § 33.1.

The law now provides "If the polls are delayed in opening for more than 15 minutes, or are interrupted for more than 15 minutes after opening, the State Board of Elections may extend the closing time by an equal number of minutes.  As authorized

20

by law, the State Board of Elections shall be available either in person or by teleconference on the day of election to approve any such extension." N.C. Gen. Stat. § 163-166.01.

## F. Socioeconomic Disparities in North Carolina

The district court found that Plaintiffs' expert testimony "demonstrate[d] that black citizens of North Carolina currently lag behind whites in several key socioeconomic indicators, including education, employment, income, access to transportation, and residential stability." McCrory, 997 F. Supp. 2d at 348. Plaintiffs presented "unchallenged statistics," for example, that (1) as of 2011-12, 34% of African American North Carolinians live below the federal poverty level, compared to 13% of whites; (2) as of the fourth quarter of 2012, unemployment rates in North Carolina were 17.3% for African Americans and 6.7% for whites; (3) 15.7% of African American North Carolinians over age 24 lack a high school degree, as compared to 10.1% of whites; (4) 27% of poor African American North Carolinians do not have access to a vehicle, compared to 8.8% of poor whites; and (5) 75.1% of whites in North Carolina live in owned homes as compared to 49.8% of African Americans. Id. at 348 n.27. The district court accepted that "North Carolina's history of official discrimination against blacks has

resulted in current socioeconomic disparities with whites." Id. at 366.

## II. **Standard of Review**

The district court made these and other findings and conclusions in an opinion and order filed August 8, 2014. Therein, the district court denied completely Plaintiffs' request for a preliminary injunction. Plaintiffs in turn filed an Emergency Motion for Injunction Pending Appeal, which we denied, instead granting Plaintiffs' motion to expedite this appeal.

We evaluate the district court's decision to deny a preliminary injunction "for an abuse of discretion[,] review[ing] the district court's factual findings for clear error and . . . its legal conclusions de novo." Pashby v. Delia, 709 F.3d 307, 319 (4th Cir. 2013) (internal quotation marks and citations omitted). A district court abuses its discretion when it misapprehends or misapplies the applicable law. See, e.g., Centro Tepeyac v. Montgomery Cnty., 722 F.3d 185, 188 (4th Cir. 2013)(en banc). "Clear error occurs when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v.

22

Harvey, 532 F.3d 326, 336 (4th Cir. 2008)(internal quotation marks and citations omitted).

III. **Preliminary Injunction Analysis**

A preliminary injunction may be characterized as being either prohibitory or mandatory. Here, Plaintiffs assert that the preliminary injunction they seek is prohibitory while Defendants claim it is mandatory, which "in any circumstance is disfavored." Taylor v. Freeman, 34 F.3d 266, 270 n.2 (4th Cir. 1994).

Whereas mandatory injunctions alter the status quo, prohibitory injunctions "aim to maintain the status quo and prevent irreparable harm while a lawsuit remains pending." Pashby, 709 F.3d at 319. We have defined the status quo for this purpose to be "the last uncontested status between the parties which preceded the controversy." Id. at 320 (internal quotation marks and citation omitted). "To be sure, it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions, but . . . [s]uch an injunction restores, rather than disturbs, the status quo ante." Aggarao v. MOL Ship Mgmt. Co., 675 F.3d 355, 378 (4th Cir. 2012) (internal quotation marks and citation omitted).

Here, Plaintiffs brought their lawsuits challenging elements of House Bill 589 on the very same day it was signed

23

into law—August 12, 2013. Plaintiffs then filed motions seeking to enjoin House Bill 589's "elimination of [same-day registration], out-of-precinct provisional voting, and pre-registration[, and] its cutback of early voting." McCrory, 997 F. Supp. 2d at 339 (emphasis added). Without doubt, this is the language and stuff of a prohibitory injunction seeking to maintain the status quo.

To win such a preliminary injunction, Plaintiffs must demonstrate that (1) they are likely to succeed on the merits; (2) they will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in their favor; and (4) the injunction is in the public interest. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).

## IV. Preliminary Injunction Denied On Certain House Bill 589 Provisions

At the outset, we determine that Plaintiffs have failed to establish at least one element necessary to win a preliminary injunction with respect to the following provisions of House Bill 589: (i) the reduction of early-voting days; (ii) the expansion of allowable voter challengers; (iii) the elimination of the discretion of county boards of elections to keep the polls open an additional hour on Election Day in "extraordinary circumstances"; (iv) the elimination of pre-registration of

24

sixteen- and seventeen-year-olds who will not be eighteen years old by the next general election; and (v) the soft roll-out of voter identification requirements to go into effect in 2016.

With respect to early voting, we are convinced that the significant risk of a substantial burden to the State tips the balance of hardships in its favor. Were we to enjoin House Bill 589's reduction in early-voting days, early voting would need to begin in approximately two weeks. We conclude that this very tight timeframe represents a burden not only on the State, but also on the county boards of elections. The balance of hardships thus favors denying a preliminary injunction as to early voting.

With respect to pre-registration of sixteen- and seventeen-year-olds, as the district court correctly noted, only citizens eighteen years and older may vote. The State's refusal to pre-register sixteen- and seventeen-year-olds will, therefore, not harm citizens who may vote in the upcoming general election. The district court therefore did not abuse its discretion in determining that, while Plaintiffs could well succeed on this claim at trial, they have not shown that "they will be irreparably harmed before trial absent an injunction." McCrory, 997 F. Supp. 2d at 378.

Regarding the elimination of the discretion of county boards of elections to keep the polls open an additional hour on

25

Election Day in "extraordinary circumstances," the district court did not abuse its discretion in finding that Plaintiffs have failed to show that they will be irreparably harmed by this provision in the upcoming election. This is particularly true, as the district court noted, given that the State Board of Elections "retains the ability to make up significant losses in time by ordering the polls to remain open on the event of a delay." Id. at 380. Again, this is not to say that Plaintiffs will not ultimately succeed with their challenge to this provision at trial. They simply have not shown irreparable harm for purposes of the preliminary injunction.

With respect to the soft roll-out of voter identification requirements to go into effect in 2016, as the district court noted, Plaintiffs did provide evidence that a husband and wife were improperly advised that they needed a photo identification in order to vote in the May 2014 primary. McCrory, 997 F. Supp. 2d at 377. While that couple was certainly misinformed, and while that fact raises a red flag, Plaintiffs cannot escape the fact that even that couple was, in fact, allowed to vote. Id. While we share Plaintiffs' concern that requiring poll workers to implement the soft rollout without adequate training might result in some confusion, we are unable to find that the district court committed clear error in deeming this argument "speculative." McCrory, 997 F. Supp. 2d at 377. Again,

26

Plaintiffs may well succeed with their challenge to the identification law at trial. We hold only that, for purposes of the upcoming election, they have not shown irreparable injury.

Finally, with respect to House Bill 589's poll challenger and observer provision, we agree with the district court that "African-American voters in North Carolina and elsewhere have good reason to be concerned about intimidation and other threats to their voting rights. Any intimidation is unlawful and cannot be tolerated, and courts must be vigilant to ensure that such conduct is rooted out where it may appear." McCrory, 997 F. Supp. 2d at 380. Nevertheless, the district court did not abuse its discretion in finding that Plaintiffs have not shown that any such irreparable harm is likely to occur in the upcoming election. The district court found that "Plaintiffs have provided no basis to suggest that poll observers or any challenger(s) will abuse their statutory power." Id. Although we are skeptical as to the ultimate accuracy of this prediction, we cannot say that the district court committed clear error.

We do not mean to suggest that Plaintiffs cannot prove and eventually succeed on their challenges to all of these provisions when their case goes to trial. Indeed, a proper application of the law to a more developed factual record could very well result in some or all of the challenged House Bill 589 provisions being struck down. At this point in time, however,

27

we hold that, for purposes of a preliminary injunction as to this November's election and based on the facts as found by the district court for the limited purpose of addressing Plaintiffs' request for a preliminary injunction, the district court did not abuse its discretion in determining that Plaintiffs have not shown that the balance of hardships tips in their favor as to early voting or that they will suffer irreparable harm as to the other provisions discussed above.

## V. Analysis Of Same-Day Registration and Out-of-Precinct Voting Challenges

We now turn to the remaining two challenged provisions of House Bill 589: the elimination of same-day registration and the prohibition on counting out-of-precinct ballots. We begin our analysis by evaluating Plaintiffs' likelihood of success on the merits of their Section 2 claims. Determining that Plaintiffs have shown that they are likely to succeed on the merits, we then proceed to the remaining elements of the preliminary injunction analysis: whether Plaintiffs are likely to suffer irreparable harm; whether the injunction is in the public interest; and finally, whether the balance of hardships tips in Plaintiffs' favor.

## A. Likelihood of Success on the Merits on Section 2

Section 2 of the Voting Rights Act forbids any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a) (formerly codified at 42 U.S.C. § 1973(a)). "A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by" citizens of protected races "in that [they] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

With Section 2, Congress effectuated a "permanent, nationwide ban on racial discrimination" because "any racial discrimination in voting is too much." Shelby Cnty., 133 S. Ct. at 2631. Accordingly, Section 2 "prohibits all forms of voting discrimination" that lessen opportunity for minority voters. Gingles, 478 U.S. at 45 n.10.

"Both the Federal Government and individuals" may sue to enforce Section 2, under which "injunctive relief is available . . . to block voting laws from going into effect." Shelby Cnty., 133 S. Ct. at 2619. Thus, in two very recent cases, courts granted injunctive relief to plaintiffs with vote-

29

denial claims where state election laws less sweeping than North Carolina's had recently been passed. <u>Ohio State Conference of N.A.A.C.P. v. Husted</u>, __ F. Supp. 2d __, 2014 WL 4377869 (S.D. Ohio 2014), <u>aff'd</u>, No. 14–3877, 2014 WL 4724703 (6th Cir. Sept. 24, 2014), <u>stayed</u>, No. 14A336, Order List 573 U.S., 2014 WL 4809069 (U.S. Sept. 29, 2014); <u>Frank v. Walker</u>, __ F. Supp. 2d. __, 2014 WL 1775432 (E.D. Wis. 2014), <u>stayed</u>, 2014 WL 4494153 (7th Cir. Sept. 12, 2014).

Under Section 2 as it exists today, showing intentional discrimination is unnecessary.[4] Instead, a Section 2 violation can "be established by proof of discriminatory results alone." <u>Chisom v. Roemer</u>, 501 U.S. 380, 404 (1991). Thus, the "right" Section 2 inquiry "is whether 'as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice.'" <u>Gingles</u>, 478 U.S. at 44 (footnote omitted)(quoting S.Rep. No. 97–417, 97th Cong.2nd Sess. 28 (1982), U.S. Code Cong. & Admin. News 1982, p. 206).

---

[4] The Supreme Court had previously read an intent requirement into Section 2, but Congress quickly amended the law to reject that interpretation. <u>See, e.g.</u>, <u>Gingles</u>, 478 U.S. at 43-44 (noting that Congress "dispositively reject[ed] the position of the plurality in <u>Mobile v. Bolden</u>, 446 U.S. 55, 100 S. Ct. 1490, 64 L.Ed.2d 47 (1980), which required proof that the contested electoral practice or mechanism was adopted or maintained with the intent to discriminate against minority voters").

In other words, "[t]he essence of a [Section] 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." Id. at 47.

Section 2's use to date has primarily been in the context of vote-dilution cases. "Vote dilution claims involve challenges to methods of electing representatives—like redistricting or at-large districts—as having the effect of diminishing minorities' voting strength." Husted, 2014 WL 4724703, at *24. The district court in this case correctly noted that there is a paucity of appellate case law evaluating the merits of Section 2 claims in the vote-denial context. McCrory, 997 F. Supp. 2d at 346. It may well be that, historically, Section 2 claims focused on vote dilution. But the predominance of vote dilution in Section 2 jurisprudence likely stems from the effectiveness of the now-defunct Section 5 preclearance requirements that stopped would-be vote denial from occurring in covered jurisdictions like large parts of North Carolina. Even the district court recognized as much. Id.

The facts of this case attest to the prophylactic success of Section 5's preclearance requirements. It appears that Section 5, which required covered jurisdictions to prove that a change in electoral law had neither "the purpose [nor] the

31

effect of denying or abridging the right to vote on account of race or color," 52 U.S.C. § 10304(a), was the only reason House Bill 589's sponsors did not reveal the "full bill" to the public until after the Shelby County decision came down. McCrory, 997 F. Supp. 2d at 336.

Nonetheless, despite the success of Section 5's preclearance requirement at tamping down vote denial in covered jurisdictions, Section 2's use to date has not been entirely dilution-focused. Rather, courts have entertained vote-denial claims regarding a wide range of practices, including restrictive voter identification laws (Frank, 2014 WL 1775432); unequal access to voter registration opportunities (Operation PUSH v. Allain, 674 F. Supp. 1245 (N.D. Miss. 1987), aff'd sub nom, Operation PUSH v. Mabus, 932 F.2d 400 (5th Cir. 1991)); unequal access to polling places (Brown v. Dean, 555 F. Supp. 502 (D.R.I. 1982)); and omnibus laws combining registration and voting restrictions (Husted, 2014 WL 4377869, aff'd, 2014 WL 4724703).

Indeed, Section 2's plain language makes clear that vote denial is precisely the kind of issue Section 2 was intended to address. Section 2 of the Voting Rights Act forbids any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). See

32

also <u>Gingles</u>, 478 U.S. at 45 n.10 ("Section 2 prohibits all forms of voting discrimination, not just vote dilution.").

Further, the principles that make vote dilution objectionable under the Voting Rights Act logically extend to vote denial. Everyone in this case agrees that Section 2 has routinely been used to address vote dilution—which basically allows all voters to 'sing' but forces certain groups to do so pianissimo. Vote denial is simply a more extreme form of the same pernicious violation—those groups are not simply made to sing quietly; instead their voices are silenced completely. A fortiori, then, Section 2 must support vote-denial claims.

Justice Scalia has provided a helpful illustration of what a Section 2 vote-denial claim might look like:

> If, for example, a county permitted voter registration for only three hours one day a week, and that made it more difficult for blacks to register than whites, blacks would have less opportunity "to participate in the political process" than whites, and [Section] 2 would therefore be violated . . . .

<u>Chisom</u>, 501 U.S. at 408 (Scalia, J., dissenting).

Based on our reading of the plain language of the statute and relevant Supreme Court authority, we agree with the Sixth Circuit that a Section 2 vote-denial claim consists of two elements:

- First, "the challenged 'standard, practice, or procedure' must impose a discriminatory burden on members of a protected class, meaning that members of the protected class 'have less

33

opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'" Husted, 2014 WL 4724703, at *24 (quoting 42 U.S.C. § 1973(a)-(b));

- Second, that burden "must in part be caused by or linked to 'social and historical conditions' that have or currently produce discrimination against members of the protected class." Id. (quoting Gingles, 478 U.S. at 47).

"In assessing both elements, courts should consider 'the totality of circumstances.'" Id. at *24 (quoting 42 U.S.C. § 1973(b)). In evaluating Section 2 claims, courts have looked to certain "typical" factors pulled directly from the Voting Rights Act's legislative history:

- The history of voting-related discrimination in the pertinent State or political subdivision;
- The extent to which voting in the elections of the pertinent State or political subdivision is racially polarized;
- The extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting;
- The exclusion of members of the minority group from candidate slating processes;
- The extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;
- The use of even subtle racial appeals in political campaigns;
- The extent to which members of the minority group have been elected to public office in the jurisdiction;
- Evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group; and

34

- The extent to which the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous.

Gingles, 478 U.S. at 44-45. These factors may shed light on whether the two elements of a Section 2 claim are met.

Notably, while these factors "may be relevant" to a Section 2 analysis, "'there is no requirement that any particular number of factors be proved, or [even] that a majority of them point one way or the other.'" Id. at 45 (quoting S. Rep. No. 97–417, 97th Cong.2nd Sess. 29 (1982), U.S. Code Cong. & Admin. News 1982, p. 207). This is not surprising, given that Congress intended to give the Voting Rights Act "the broadest possible scope." Allen v. State Bd. of Elections, 393 U.S. 544, 567 (1969).

Instead, courts must undertake "a searching practical evaluation of the 'past and present reality,' [with] a 'functional' view of the political process." Gingles, 478 U.S. at 45 (quoting S. Rep. at 30, U.S. Code Cong. & Admin. News 1982, p. 208). Courts must make "an intensely local appraisal of the design and impact of" electoral administration "in the light of past and present reality." Id. at 78 (quoting White v. Regester, 412 U.S. 755, 769-70 (1973)).

With this legal framework in mind, we turn now to the district court's Section 2 analysis.

## 1. The District Court Misapprehended and Misapplied the Law

A close look at the district court's analysis here reveals numerous grave errors of law that constitute an abuse of discretion. Centro Tepeyac, 722 F.3d at 188.

First, the district court bluntly held that "Section 2 does not incorporate a 'retrogression' standard" and that the court therefore was "not concerned with whether the elimination of [same-day registration and other features] will worsen the position of minority voters in comparison to the preexisting voting standard, practice or procedure—a Section 5 inquiry." McCrory, 997 F. Supp. 2d at 351-52 (internal quotation marks and citations omitted).

Contrary to the district court's statements, Section 2, on its face, requires a broad "totality of the circumstances" review. 52 U.S.C. § 10301(b). Clearly, an eye toward past practices is part and parcel of the totality of the circumstances.

Further, as the Supreme Court noted, "some parts of the [Section] 2 analysis may overlap with the [Section] 5 inquiry." Georgia v. Ashcroft, 539 U.S. 461, 478 (2003). Both Section 2 and Section 5 invite comparison by using the term "abridge[]." Section 5 states that any voting practice or procedure "that has the purpose of or will have the effect of diminishing the

36

ability of any citizens of the United States on account of race or color . . . to elect their preferred candidates of choice denies or <u>abridges</u> the right to vote." 52 U.S.C. § 10304(b) (emphasis added). Section 2 forbids any "standard, practice, or procedure" that "results in a denial or <u>abridgement</u> of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a) (emphasis added). The Supreme Court has explained that "[t]he term 'abridge,' . . . whose core meaning is 'shorten,'. . . necessarily entails a comparison. It makes no sense to suggest that a voting practice 'abridges' the right to vote without some baseline with which to compare the practice." <u>Reno v. Bossier Parish Sch. Bd.</u>, 528 U.S. 320, 333–34 (2000) (citations omitted).

Neither the Supreme Court nor this Court has ever held that, in determining whether an abridgement has occurred, courts are categorically barred from considering past practices, as the district court here suggested. In fact, opinions from other circuits support the opposite conclusion. For example, the Tenth Circuit, quoting directly from Section 2's legislative history, has explained that "'[i]f [a challenged] procedure markedly departs from past practices or from practices elsewhere in the jurisdiction, that bears on the fairness of its impact.'" <u>Sanchez v. State of Colo.</u>, 97 F.3d 1303, 1325 (10th Cir. 1996) (quoting 1982 U.S.C.C.A.N. at 207, n.117). And as the Sixth

37

Circuit recently held, under Section 2, "the focus is whether minorities enjoy less opportunity to vote as compared to other voters. The fact that a practice or law eliminates voting opportunities that used to exist under prior law that African Americans disproportionately used is therefore relevant to an assessment of whether, under the current system, African Americans have an equal opportunity to participate in the political process as compared to other voters." Husted, 2014 WL 4724703, at *28.

In this case, North Carolina's previous voting practices are centrally relevant under Section 2. They are a critical piece of the totality-of-the-circumstances analysis Section 2 requires. In refusing to consider the elimination of voting mechanisms successful in fostering minority participation, the district court misapprehended and misapplied Section 2.

Second, the district court considered each challenged electoral mechanism only separately. See McCrory, 997 F. Supp. 2d at 344 (addressing same-day registration), at 365 (addressing out-of-precinct voting), at 370 (early voting), at 375 (identification requirements), at 378 (pre-registration of teenagers), and at 379 (poll challengers and elimination of discretion to keep the polls open). Yet "[a] panoply of regulations, each apparently defensible when considered alone, may nevertheless have the combined effect of severely

38

restricting participation and competition." Clingman v. Beaver, 544 U.S. 581, 607-08 (2005) (O'Connor, J., concurring in part and concurring in the judgment).

By inspecting the different parts of House Bill 589 as if they existed in a vacuum, the district court failed to consider the sum of those parts and their cumulative effect on minority access to the ballot box. Doing so is hard to square with Section 2's mandate to look at the "totality of the circumstances," 52 U.S.C. § 10301(b), as well as Supreme Court precedent requiring "a searching practical evaluation" with a "functional view of the political process." Gingles, 478 U.S. at 45 (internal quotation marks and citations omitted). By looking at each provision separately and failing to consider the totality of the circumstances, then, the district court misapprehended and misapplied the pertinent law.

Third, the district court failed to adequately consider North Carolina's history of voting discrimination. Instead the district court parroted the Supreme Court's proclamation that "'history did not end in 1965,'" McCrory, 997 F. Supp. 2d at 349 (quoting Shelby Cnty., 133 S. Ct. at 2628) and that "'[p]ast discrimination cannot, in the manner of original sin, condemn governmental action.'" Id. (quoting City of Mobile, Ala. v. Bolden, 446 U.S. 55, 74 (1980)).

Of course, the history of voting discrimination in many states in fact did substantially end in 1965—due in large part to the Voting Rights Act. The Supreme Court's observation that a state's history should not serve to condemn its future, however, does not absolve states from their future transgressions. As Justice Ginsburg pointed out in her <u>Shelby County</u> dissent, casting aside the Voting Rights Act because it has worked "to stop discriminatory changes is like throwing away your umbrella in a rainstorm because you are not getting wet." 133 S. Ct. at 2650 (Ginsburg, J., dissenting).

Immediately after <u>Shelby County</u>, i.e., literally the next day, when "history" without the Voting Rights Act's preclearance requirements picked up where it left off in 1965, North Carolina rushed to pass House Bill 589, the "full bill" legislative leadership likely knew it could not have gotten past federal preclearance in the pre-<u>Shelby County</u> era. <u>McCrory</u>, 997 F. Supp. 2d at 336. Thus, to whatever extent the Supreme Court could rightly celebrate voting rights progress in <u>Shelby County</u>, the post-<u>Shelby County</u> facts on the ground in North Carolina should have cautioned the district court against doing so here.

Fourth, in analyzing the elimination of same-day registration, the district court looked to the National Voter Registration Act, which generally allows for a registration cut-off of thirty days before an election. <u>McCrory</u>, 997 F. Supp. 2d

40

at 352. The district court then declared that "it is difficult to conclude that Congress intended that a State's adoption of a registration cut-off before election day would constitute a violation of Section 2." Id. In doing so, the district court lost sight of the fact that the National Voter Registration Act merely sets a floor for state registration systems.

That North Carolina used to exceed National Voter Registration Act registration minimums does not entitle it to eliminate its more generous registration provisions without ensuring that, in doing so, it is not violating Section 2. Indeed, Congress made that quite clear by including in the National Voter Registration Act an express warning that the rights and remedies it established shall not "supersede, restrict, or limit the application of the Voting Rights Act." 52 U.S.C. § 20510(d)(1).

Fifth, also with respect to same-day registration, the district court suggested that because voting was not completely foreclosed and because voters could still register and vote by mail, a likely Section 2 violation had not been shown. See McCrory, 997 F. Supp. 2d at 356 (noting that "North Carolina provides several other ways to register" besides same-day registration that "have not been shown to be practically unavailable to African-American residents").

41

However, nothing in Section 2 requires a showing that voters cannot register or vote under any circumstance. Instead, it requires "that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." Gingles, 478 U.S. at 47. In waiving off disproportionately high African American use of certain curtailed registration and voting mechanisms as mere "preferences" that do not absolutely preclude participation, the district court abused its discretion. See McCrory, 997 F. Supp. 2d at 351.

Sixth, Section 2, on its face, is local in nature. Under Section 2, "[a] violation . . . is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by citizens of protected races." 52 U.S.C. § 10301(b) (emphasis added). As the Supreme Court has noted, in undertaking a Section 2 analysis, courts make "an intensely local appraisal of the design and impact of" electoral administration "in the light of past and present reality." Gingles, 478 U.S. at 78.

Nevertheless, without any basis in the statute or binding precedent, the district court suggested that a practice must be discriminatory on a nationwide basis to violate Section 2 and

42

held that a conclusion it might reach as to North Carolina would somehow throw other states' election laws into turmoil. For example, the district court stated that "a determination that North Carolina is in violation of Section 2 merely for maintaining a system that does not count out-of-precinct provisional ballots could place in jeopardy the laws of the majority of the States, which have made the decision not to count such ballots." McCrory, 997 F. Supp. 2d at 367. The district court's failure to understand the local nature of Section 2 constituted grave error. Cf. Husted, 2014 WL 4724703, at *29 ("There is no reason to think our decision here compels any conclusion about the early-voting practices in other states, which do not necessarily share Ohio's particular circumstances.").

Seventh, the district court minimized Plaintiffs' claim as to out-of-precinct voting because "so few voters cast" ballots in the wrong precincts. McCrory, 997 F. Supp. 2d at 366. The district court accepted evidence that "approximately 3,348 out-of-precinct provisional ballots cast by [African American] voters were counted to some extent in the 2012 general election." Id. Going forward under House Bill 589, a substantial number of African American voters will thus likely be disenfranchised.

43

Though the district court recognized that "failure to count out-of-precinct provisional ballots will have a disproportionate effect on [African American] voters," it held that such an effect "will be minimal." Id. Setting aside the basic truth that even one disenfranchised voter—let alone several thousand—is too many, what matters for purposes of Section 2 is not how many minority voters are being denied equal electoral opportunities but simply that "any" minority voter is being denied equal electoral opportunities. 52 U.S.C. § 10301(a) (forbidding any "standard, practice, or procedure" that interacts with social and historical conditions and thereby "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color") (emphasis added).

Eighth and finally, the district court rationalized election administration changes that disproportionately affected minority voters on the pretext of procedural inertia and under-resourcing. For example, in evaluating Plaintiffs' Section 2 challenge to the elimination of same-day registration, the district court noted that county boards of elections "sometimes lack[] sufficient time to verify registrants." McCrory, 997 F. Supp. 2d at 353. But in detailing why that was so, the district court exposed that the problem's roots lie largely in boards of elections' own procedures. Id. at 353 and n.36. The district

44

court then noted that "a voter who registered before the 'close of books' 25 days before election day will have more time to pass the verification procedure than a voter who registered and voted during early voting." McCrory, 997 F. Supp. 2d at 353. But more time alone guarantees nothing, and nothing suggests that a voter who registers earlier will therefore be verified before voting.

The district court failed to recognize, much less address, the problem of sacrificing voter enfranchisement at the altar of bureaucratic (in)efficiency and (under-)resourcing. After all, Section 2 does not prescribe a balancing test under which the State can pit its desire for administrative ease against its minority citizens' right to vote. The district court thus abused its discretion when it held that "[i]t is sufficient for the State to voice concern that [same-day registration] burdened [county boards of elections] and left inadequate time for elections officials to properly verify voters." Id. at 354.

These flaws in the district court's Section 2 analysis make it clear that the district court both misapprehended and misapplied the pertinent law. Accordingly, the district court abused its discretion. Centro Tepeyac, 722 F.3d at 188.

45

## 2. Proper Application of Section 2

Properly applying the law to the facts, even as the district court portrayed them, shows that Plaintiffs are, in fact, likely to succeed on the merits of their Section 2 claims regarding the elimination of same-day registration and out-of-precinct voting, contrary to the district court's determination.

In the first step of our Section 2 analysis, we must determine whether House Bill 589's elimination of same-day registration and out-of-precinct voting imposes a discriminatory burden on members of a protected class, meaning that members of the protected class "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. 10301. See also Husted, 2014 WL 4724703, at *24 (identifying the two steps of the Section 2 vote-denial inquiry).

There can be no doubt that certain challenged measures in House Bill 589 disproportionately impact minority voters. The district court found that Plaintiffs "presented unrebutted testimony that [African American] North Carolinians have used [same-day registration] at a higher rate than whites in the three federal elections during which [same-day registration] was offered" and recognized that the elimination of same-day registration would "bear more heavily on African-Americans than whites." McCrory, 997 F. Supp. 2d at 348-49. The district

46

court also "accept[ed] the determinations of Plaintiffs' experts that" African American voters disproportionately voted out of precinct and that "the prohibition on counting out-of-precinct provisional ballots will disproportionally affect [African American] voters."  Id. at 366.

Second, we must determine whether this impact was in part "caused by or linked to 'social and historical conditions' that have or currently produce discrimination against members of the protected class."  Husted, 2014 WL 4724703, at *24 (quoting Gingles, 478 U.S. at 47).  Here, when we apply the proper legal standard to the district court's findings, the disproportionate impacts of eliminating same-day registration and out-of-precinct voting are clearly linked to relevant social and historical conditions.

In making this determination, we are aided by consideration of the "typical" factors that Congress noted in Section 2's legislative history.  However we recognize that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other."  Gingles, 478 U.S. at 45 (internal quotation marks and citation omitted).

Regarding the history of voting-related discrimination in the pertinent State, the district court found that "North Carolina . . . has an unfortunate history of official discrimination in voting and other areas that dates back to the

47

Nation's founding.  This experience affects the perceptions and realities of [African American] North Carolinians to this day." McCrory, 997 F. Supp. 2d at 349.

One of Plaintiffs' witnesses testified, for example, that at around age 19—in the 1940s—she was required to recite the Preamble to the Constitution from memory in order to register to vote.  Id. at 349 n.29.  As of 1965, 39 counties in North Carolina were considered covered jurisdictions under the Voting Rights Act, having "maintained a test or device as a prerequisite to voting as of November 1, 1964, and [having] had less than 50 percent voter registration or turnout in the 1964 Presidential election."  Shelby Cnty., 133 S. Ct. at 2620.  And in 1975, when the Voting Rights Act's preclearance formula was extended to cover jurisdictions that provided "English-only voting materials in places where over five percent of voting-age citizens spoke a single language other than English," several additional North Carolina counties became covered jurisdictions. Id.

The district court recognized that the legacy of overtly discriminatory practices such as these and the concurrent "struggle for African-Americans' voting rights" justifies North Carolinians' skepticism of changes to voting laws.  McCrory, 997 F. Supp. 2d at 349.  The fact that the Supreme Court struck down the Voting Rights Act's "covered jurisdictions" formula in

48

Shelby County does not allow us to simply ignore Congress's directive to view current changes to North Carolina's voting laws against the mire of its past.

Regarding effects of past discrimination that hinder minorities' ability to participate effectively in the political process, the district court pronounced that "Plaintiffs' expert testimony demonstrates that [African American] citizens of North Carolina currently lag behind whites in several key socioeconomic indicators, including education, employment, income, access to transportation, and residential stability." McCrory, 997 F. Supp. 2d at 348. To this end, Plaintiffs presented the following unchallenged statistics: (1) as of 2011-12, 34% of African American North Carolinians live below the federal poverty level, compared to 13% of whites; (2) as of the fourth quarter of 2012, unemployment rates in North Carolina were 17.3% for African Americans and 6.7% for whites; (3) 15.7% of African American North Carolinians over age 24 lack a high school degree, as compared to 10.1% of whites; (4) 27% of poor African American North Carolinians do not have access to a vehicle, compared to 8.8% of poor whites; and (5) 75.1% of African Americans in North Carolina live in owned homes as compared to 49.8% of whites. Id. at n.27.

Finally, as to the tenuousness of the reasons given for the restrictions, North Carolina asserts goals of electoral

49

integrity and fraud prevention.  But nothing in the district court's portrayal of the facts suggests that those are anything other than merely imaginable.  And "states cannot burden the right to vote in order to address dangers that are remote and only 'theoretically imaginable.'"  Frank, 2014 WL 1775432, at *8 (quoting Williams v. Rhodes, 393 U.S. 23, 33 (1968)).

Indeed, the best fact for North Carolina in the district court's opinion—the only specific problem cited, beyond naked statements of bureaucratic difficulty attributable at least as much to under-resourcing of boards of elections—is that a thousand votes that had not yet been properly verified had been counted in an election.  McCrory, 997 F. Supp. 2d at 353.  But nothing in the district court's opinion suggests that any of those were fraudulently or otherwise improperly cast.  Thus, even the best fact the State could muster is tenuous indeed.

At the end of the day, we cannot escape the district court's repeated findings that Plaintiffs presented undisputed evidence showing that same-day registration and out-of-precinct voting were enacted to increase voter participation, that African American voters disproportionately used those electoral mechanisms, and that House Bill 589 restricted those mechanisms and thus disproportionately impacts African American voters.  To us, when viewed in the context of relevant "social and historical conditions" in North Carolina, Gingles, 478 U.S. at

50

47, this looks precisely like the textbook example of Section 2 vote denial Justice Scalia provided:

> If, for example, a county permitted voter registration for only three hours one day a week, and that made it more difficult for blacks to register than whites, blacks would have less opportunity "to participate in the political process" than whites, and [Section] 2 would therefore be violated . . . .

Chisom, 501 U.S. at 408.

Further, even if we were to accept North Carolina's purported non-discriminatory basis for keeping the full bill a secret until the federal preclearance regime had been thrown over in Shelby County, we cannot ignore the discriminatory results that several measures in House Bill 589 effectuate. Section 2's "'results' criterion provides a powerful, albeit sometimes blunt, weapon with which to attack even the most subtle forms of discrimination." Chisom, 501 U.S. at 406 (Scalia, J., dissenting). Neither North Carolina nor any other jurisdiction can escape the powerful protections Section 2 affords minority voters by simply "espous[ing]" rationalizations for a discriminatory law. McCrory, 997 F. Supp. 2d at 357.

While plaintiffs seeking preliminary injunctions must demonstrate that they are likely to succeed on the merits, they "need not show a certainty of success." Pashby, 709 F.3d at 321. For the reasons set out above, Plaintiffs here have shown that with respect to the challenged provisions of House Bill 589

51

affecting same-day registration and out-of-precinct voting, they are likely to succeed with their Section 2 claims. In deciding otherwise, the district court abused its discretion.

B. Irreparable Harm, the Public Interest, and the Balance of Hardships

Having concluded that Plaintiffs have met the first test for a preliminary injunction, likelihood of success on the merits, as to their same-day registration and out-of-precinct voting challenges, we must consider whether the other elements have similarly been met. In other words, we must analyze whether Plaintiffs are likely to suffer irreparable harm; the balance of the hardships; and whether the injunction is in the public interest. Winter, 555 U.S. at 20.

Courts routinely deem restrictions on fundamental voting rights irreparable injury. See, e.g., Obama for Am. v. Husted, 697 F.3d 423, 436 (6th Cir. 2012); Williams v. Salerno, 792 F.2d 323, 326 (2d Cir. 1986); cf. Alternative Political Parties v. Hooks, 121 F.3d 876 (3d Cir. 1997). And discriminatory voting procedures in particular are "the kind of serious violation of the Constitution and the Voting Rights Act for which courts have granted immediate relief." United States v. City of Cambridge, 799 F.2d 137, 140 (4th Cir. 1986). This makes sense generally and here specifically because whether the number is thirty or thirty-thousand, surely some North Carolina minority voters will

52

be disproportionately adversely affected in the upcoming election. And once the election occurs, there can be no do-over and no redress. The injury to these voters is real and completely irreparable if nothing is done to enjoin this law.[5]

By definition, "[t]he public interest . . . favors permitting as many qualified voters to vote as possible." Husted, 697 F.3d at 437. See also Purcell v. Gonzalez, 549 U.S. 1, 4 (2006) (The public has a "strong interest in exercising the fundamental political right to vote." (citations omitted)). And "upholding constitutional rights serves the public interest." Newsome v. Albermarle Cnty. Sch. Bd., 354 F.3d 249, 261 (4th Cir. 2003). The election laws in North Carolina prior to House Bill 589's enactment encouraged participation by qualified voters. But the challenged House Bill 589 provisions stripped them away. The public interest thus weighs heavily in Plaintiffs' favor.

---

[5] The district court seemingly failed to understand this point. For instance, in ruling that reduction in early voting was unlikely to cause irreparable harm to African American voters, the district court noted that during the 2010 midterm election, "the racial disparity in early-voting usage that was observed in 2008 and 2012 all but disappeared." McCrory, 997 F. Supp. 2d at 372. In fact, the disparity was reduced from twenty percent to three percent. Thus, the district court seemed to believe that the injury to a smaller margin of African American voters that would occur during a midterm election year would be somehow less "irreparable." That conclusion misapprehends the irreparable harm standard and constituted an abuse of discretion.

By contrast, balancing the hardships is not wholly unproblematic for Plaintiffs. North Carolina will have little time to implement the relief we grant. But for some of the challenged changes, such as the elimination of same-day registration, systems have existed, do exist, and simply need to be resurrected. Similarly, counting out-of-precinct ballots merely requires the revival of previous practices or, however accomplished, the counting of a relatively small number of ballots.[6]

In conclusion, Plaintiffs have satisfied every element required for a preliminary injunction as to their Section 2 claims relating to same-day registration and out-of-precinct voting.[7] Accordingly, the district court abused its discretion

---

[6] In Purcell, 549 U.S. 1, on which the dissenting opinion relies, the Supreme Court seemed troubled by the fact that a two-judge motions panel of the Ninth Circuit entered a factless, groundless "bare order" enjoining a new voter identification provision in an impending election. At the time of the "bare order," the appellate court also lacked findings by the district court. By contrast, neither district court nor appellate court reasoning, nor lengthy opinions explaining that reasoning, would be lacking in this case.

[7] By not addressing Plaintiffs' constitutional claims, we do not mean to suggest that we agree with the district court's analysis. But because we find that Plaintiffs are likely to succeed on the merits under the Voting Rights Act, we need not, and therefore do not, reach the constitutional issues.

in refusing to grant the requested injunctive relief as to those provisions.[8]

## VI. __Relief Granted__

Appellate courts have the power to vacate and remand a denial of a preliminary injunction with specific instructions for the district court to enter an injunction. See, e.g., Elrod v. Burns, 427 U.S. 347, 350 (1976) (affirming the Seventh Circuit's grant of a preliminary injunction the district court had denied); Am. Civil Liberties Union of Ill. v. Alvarez, 679 F.3d 583, 608 (7th Cir. 2012) (reversing and remanding with instructions to enter a preliminary injunction); Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd., 354 F.3d 249, 252 (4th Cir. 2003) (vacating the district court's order and remanding with instructions to enter a preliminary injunction).

---

[8] We respectfully disagree with the dissenting opinion that our decision today will create any significant voter confusion. The continuation of same-day registration and out-of-precinct voting after today's decision means more opportunity to register and vote than if the entirety of House Bill 589 were in effect for this election. Voters who are confused about whether they can, for example, still register and vote on the same day will have their votes counted. In this sense, our decision today acts as a safety net for voters confused about the effect of House Bill 589 on their right to vote while this litigation proceeds.

For the many reasons above, we remand with instructions to the district court to enter as swiftly as possible a preliminary injunction granting the following relief:

- Part 16: House Bill 589's elimination of Same-Day Voter Registration, previously codified at G.S. 163-82.6A, is enjoined, with the provisions in effect prior to House Bill 589's enactment in full force pending the conclusion of a full hearing on the merits;

- Part 49: House Bill 589's elimination of Voting in Incorrect Precinct, previously codified at G.S. 163-55, is enjoined, with the provisions in effect prior to House Bill 589's enactment in full force pending the conclusion of a full hearing on the merits.

<u>REVERSED IN PART, AFFIRMED IN PART, AND REMANDED WITH INSTRUCTIONS TO ENTER A PRELIMINARY INJUNCTION</u>

DIANA GRIBBON MOTZ, Circuit Judge, dissenting:

With great respect for my colleagues' contrary views and genuine regret that we cannot agree on the outcome of these important cases, I dissent.

At the center of these cases are changes made by the North Carolina General Assembly to the State's election laws. Plaintiff-Appellants and the United States moved the district court to grant a preliminary injunction prohibiting the State of North Carolina from enforcing many of the new laws. After considering the evidence offered at a week-long hearing (including the testimony of twelve witnesses and thousands of pages of written material) and the extensive written and oral legal arguments, the district court denied the motions. The court explained its reasoning in a 125-page opinion and order. Three sets of plaintiffs appealed; the United States did not. The district court's order is now before us, on interlocutory appeal, less than five weeks before voters in North Carolina go to the polls in a statewide general election.

Nothing in the record suggests that any dilatoriness by either the parties or the court caused this unfortunate timing. For, to give the important issues at stake here their due required extensive preparation, including months of discovery by the parties, and consideration and analysis by the district court. But the fact of the timing remains. Appellants ask this

court to reverse the district court's denial of relief, and to grant a preliminary injunction requiring the State to revert to abandoned election procedures for which the State maintains it has not, and is not, prepared.  For the reasons that follow, I cannot agree that such extraordinary relief should issue.

I.

To obtain a preliminary injunction, a plaintiff must establish that:  (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest.  Winter v. Natural Res. Def. Council, 555 U.S. 7, 20 (2008).  Critically, each of these four requirements must be satisfied. Id.  Moreover, a plaintiff must make a "clear" showing both that he is likely to suffer irreparable harm absent relief and he is likely succeed on the merits at trial.  Id.; Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089 (2010).

The majority emphasizes that unlawfully or unconstitutionally depriving North Carolinians of the opportunity to vote is an irreparable harm.  I do not contend to the contrary.  But by the same token, the requested injunction will require the State to halt the ongoing implementation of one

58

of its duly enacted statutes -- a statute that, for now at least, has not been rendered invalid. As the Chief Justice recently reminded us, this itself constitutes "a form of irreparable injury." Maryland v. King, 133 S.Ct. 1, 3 (2012) (Roberts, C.J., in chambers).

Moreover, even a showing of irreparable harm does not, without more, entitle a plaintiff to a preliminary injunction. While we once permitted the mere presence of "grave or serious questions for litigation" to tip the balance in the movant's favor, Rum Creek Coal Sales, Inc. v. Caperton, 926 F.2d 353, 363 (4th Cir. 1991), we have since recognized that this approach is in "fatal tension" with the Supreme Court's instruction in Winter that all four factors must be independently satisfied. Real Truth, 575 F.3d at 346. Accordingly, no matter how likely the irreparable injury absent an injunction, a plaintiff can obtain a preliminary injunction only if he demonstrates a clear likelihood of success on the merits, and the balance of equities favors him, and the injunction is in the public interest.

Such plaintiffs comprise a small class. As the Supreme Court explained in Winter, the grant of a preliminary injunction is "an extraordinary remedy never awarded as of right." 555 U.S. at 24; see also id. at 32 (noting that even issuance of a permanent injunction after trial "is a matter of equitable discretion; it does not follow from success on the merits as a

59

matter of right."). In a recent case, our en banc court similarly recognized that the grant of such a remedy involves "the exercise of a very far-reaching power, which is to be applied only in [the] limited circumstances which clearly demand it." Centro Tepeyac v. Montgomery Cnty., 722 F.3d 184, 188 (4th Cir. 2013) (en banc) (internal citation and quotation marks omitted).

Our review of a district court's denial of such an "extraordinary remedy" is also highly deferential. We review the grant or denial of a preliminary injunction for "abuse of discretion." Real Truth, 575 F.3d at 345-47. Under this standard, we review the district court's factual findings for clear error. Pashby v. Delia, 709 F.3d 307, 319 (4th Cir. 2013). We review its "legal rulings de novo" but we review the district court's "ultimate decision to issue the preliminary injunction for abuse of discretion." Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 428 (2006). Thus, as the Third Circuit has explained, an appellate court "use[s] a three-part standard to review a District Court's grant of a preliminary injunction: we review the Court's findings of fact for clear error, its conclusions of law de novo, and the ultimate decision to grant the preliminary injunction for abuse of discretion." Miller v. Mitchell, 598 F.3d 139, 145 (3d Cir. 2010).

60

While securing reversal of a denial of preliminary relief is an uphill battle for any movant, Appellants face a particularly steep challenge here.  For "considerations specific to election cases," including the risk of voter confusion, Purcell v. Gonzalez, 549 U.S. 1, 4-5 (2006), counsel extreme caution when considering preliminary injunctive relief that will alter electoral procedures.[*]  Because those risks increase "[a]s an election draws closer," id. at 5, so too must a court's caution.  Cf. Riley v. Kennedy, 553 U.S. 406, 426 (2008) ("[P]ractical considerations sometimes require courts to allow elections to proceed despite pending legal challenges.").  Moreover, election cases like the one at hand, in which an appellate court is asked to reverse a district court's denial of a preliminary injunction, risk creating "conflicting orders" which "can themselves result in voter confusion and consequent

---

[*]  Although the majority steadfastly asserts that the requested injunction seeks only to maintain the status quo, the provisions challenged by Appellants were enacted more than a year ago and governed the statewide primary elections held on May 6, 2014.  Appellants did not move for a preliminary injunction until May 19, 2014, almost two weeks after the new electoral procedures had been implemented in the primary. Moreover, regardless of how one conceives of the status quo, there is simply no way to characterize the relief requested by Appellants as anything but extraordinary.  Appellants ask a federal court to order state election officials to abandon their electoral laws without first resolving the question of the legality of those laws.

61

incentive to remain away from the polls." <u>Purcell</u>, 549 U.S. at 4-5.

## II.

Given the standard of review, and the Supreme Court's teaching on injunctive relief in the weeks before an election, I cannot join the majority in reversing the judgment of the district court.

My colleagues argue that we should reverse because, in assessing the likelihood of Appellants' success on the merits, the district court articulated certain legal standards incorrectly. Such a misstep, they assert, constitutes an abuse of discretion and so requires reversal and grant of injunctive relief. Usually an error of law does constitute an abuse of discretion and does require reversal. But when reviewing the denial of a preliminary injunction, an appellate court can find an abuse of discretion requiring reversal only if the appellant demonstrates that the corrected standard renders its likelihood of success clear and establishes that the other requirements for a preliminary injunction have been met.

In my view, Appellants have not done this here. That is, Appellants have neither established a clear likelihood of success on the merits, nor demonstrated, particularly at this late juncture, that the balance of the equities and the public

62

interest weigh in their favor.  Absent the required showing on each of these elements, the district court's "ultimate decision" to deny preliminary relief was not an abuse of discretion. O Centro, 546 U.S. at 428.

III.

Giving due deference, as we must, to the district court's findings of fact, Appellants have not established that the district court abused its discretion in finding no clear likelihood of their success on the merits.  This is not to say that I believe the district court's legal analysis was without error, only that Appellants have not shown that correcting the errors would render clear their likelihood of success.

For instance, I am troubled by the court's failure to consider the cumulative impact of the changes in North Carolina voting law.  Specifically, the district court found that prohibiting the counting of out-of-precinct provisional ballots would not burden minority voters because early voting provides "ample opportunity" for individuals "who would vote out-of-precinct" to otherwise cast their ballot.  North Carolina State Conference of Branches of the NAACP v. McCrory, 997 F. Supp. 2d 322, 367 (M.D.N.C. 2014).  That finding rests on the assumption that eliminating a week of early voting still leaves minority voters with "ample opportunity."  But the district court

63

discussed plaintiffs' challenges to these two provisions without acknowledging that the burden imposed by one restriction could reinforce the burden imposed by others. Compare id. at 366-68 with id. at 370-75. Similarly, the district court discussed same-day registration, id. at 46, without recognizing that eliminating, in one fell swoop, preferred methods of both registration and ballot casting has a more profound impact on the opportunity to vote than simply eliminating one or the other. Cf. Pisano v. Strach, 743 F.3d 927, 933 (4th Cir. 2014) ("When deciding whether a state's filing deadline is unconstitutionally burdensome, we evaluate the combined effect of the state's ballot-access regulations." (emphasis added)).

At this stage, however, I cannot conclude that correcting these, or similar, errors requires the holding that Appellants are clearly likely to succeed on the merits. The district court's factual findings about early voting and same-day registration suggest Appellants' evidence simply did not sway the court. The court rejected as unpersuasive evidence offered that constricting the early voting period assertedly would create long lines at the polls, McCrory, 997 F. Supp. 2d at 372, affect black voters disproportionately, id., or cut down on Sunday voting hours in the upcoming election. Id. at 373. So too with same-day registration: the district court rejected Appellants' assertions that eliminating same-day registration

64

would cause registration rates among black North Carolinians to drop. Id. at 350. Whatever the wisdom of these factual findings, they are not clearly erroneous.

In short, had I been overseeing this case in the district court, I might have reached a different conclusion about Plaintiffs' chances of success on the merits. But neither I nor my colleagues oversaw this case and its 11,000-page record. Nor did we consider the evidence and arguments produced in five days of hearings. And though I share some of my colleagues' concerns about the district court's legal analysis, those concerns do not establish that plaintiffs have shown a clear likelihood of success on the merits.

IV.

Further, Appellants have not shown that the balance of equities and the public interest support issuance of the preliminary injunction they seek. Any such showing would require overcoming the burden the State faces in complying with ordered changes to its election procedures and the risk of confusing voters with dueling opinions so close to the election.

Election day is less than five weeks away, and other deadlines loom even closer. In fact, for the many North Carolina voters that have already submitted absentee ballots, this election is already underway. The majority's grant of

65

injunctive relief requires boards of elections in North Carolina's 100 counties to offer same-day registration during the early voting period and count out-of-precinct provisional ballots -- practices for which neither the State nor the local boards have prepared. See, e.g., Poucher Decl. 4, ECF No. 146-1 ("To have to revert back to conducting an election under the prior statute would be confusing to [election] officials, and again unfunded.").

The majority suggests that the State exaggerates the burden imposed on it, and that resurrecting past practices is a simple matter. Perhaps. But the logistics of running an election seem to me far more complex than my colleagues suggest. Poll workers have been trained and polling centers have been equipped in reliance on the procedures that governed the most recent statewide primary. An injunction will render some of those procedures a nullity. Additionally, it is undisputed that the same-day registration system used in elections under the prior law was administered electronically through an application embedded within a comprehensive computer program. That application was disengaged after the enactment of SL 2013-381, and is now out of date. Reliable restoration of the application in time for the general election is apparently impossible. For this reason, the injunction will require the same-day registration process to be manually administered by each county

board, risking delays, errors, and general confusion. Thus, while reverting to the old procedure may make for a simple order, it will require substantial effort to effectuate in practice.

In addition to the burden it places on the State, an about-face at this juncture runs the very real risk of confusing voters who will receive incorrect and conflicting information about when and how they can register and cast their ballots. Under North Carolina law, ensuring voters have the correct information in a timely fashion is not just good policy, it is a statutory mandate. See N.C. Gen. Stat. § 163-278.69 (a). The State is required to send to every household a Judicial Voter Guide "no more than 28 days nor fewer than seven days before" early voting begins. Id. We were told at oral argument that this Guide, and a timeline of important dates, have already been printed and sent to every household in the State, and have been made available on the State Board of Elections' website. See 2014 General Election Judicial Voter Guide, http://www.ncsbe.gov/ncsbe/Portals/0/FilesT/JudicialVoter Guide2014.pdf (last visited Sept. 30, 2014). The majority's order renders this information inaccurate. For instance, the current Guide lists a registration cut-off date of October 10 and instructs voters that they must vote in their proper precinct. Id. Moreover, the widespread dissemination of flat-

out contradictory information undermines confidence in the State's ability to carry out orderly elections.

Recognizing the importance of avoiding confusion at the polls, both we and the Supreme Court have deferred to a state's own assessment of when such confusion is likely to occur. See, e.g., U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 834 (1995); Munro v. Socialist Workers Party, 479 U.S. 189, 195-96 (1986); Pisano, 743 F.3d at 937. The majority downplays the State's concerns about confusion here, suggesting that the effect of any confusion will be minimal. My colleagues see the injunction as a "safety net" that will ensure that any confused voters at least have the opportunity to cast a ballot. But this assumes that those who may be confused by "conflicting orders" will resist the "consequent incentive to remain away from the polls." Purcell, 549 U.S. at 5. For "conflicting orders" cause not only uncertainty about the status of particular voting procedures, but also general frustration with and distrust of an election process changed on the eve of the election itself.

In sum, to obtain a preliminary injunction, Appellants must establish that the balance of hardships and public interest weigh in their favor. I cannot conclude that they have done so here.

V.

Appellants will have the opportunity at trial to demonstrate precisely how SL 2013-381 burdens voters in North Carolina. And if Appellants can show that the multiple provisions of that law work in tandem to limit voting opportunities, I am confident that the district court will consider the totality of that burden. A law that adopts a "death by a thousand cuts" approach to voting rights is no more valid than a law that constricts one aspect of the voting process in a particularly onerous manner. But at this juncture, in my view, Plaintiffs have not met the high bar necessary to obtain the relief they seek. Accordingly, I respectfully dissent.