DAMON J. KEITH,
concurring in part, dissenting in part.
Democracies die behind closed doors. Detroit Free Press v. Ashcroft, 303 F.3d 681, 683 (6th Cir. 2002). By denying the most vulnerable the right to vote, the Majority shuts minorities out of our political process. Rather than honor the men and women whose murdered lives opened the doors of our democracy and secured our right to vote, the Majority has abandoned this court’s standard of review in ordér to conceal the votes of the most defenseless behind the dangerous veneers of factual findings lacking support and legal standards lacking precedent. I am deeply saddened and distraught by the court’s deliberate decision to reverse the progress of history. I dissent.
In 2014, Ohio enacted Senate Bills 205 and 216, which (1) required county elections boards to reject the ballots of absentee and provisional voters whose identification envelopes or affirmation forms, respectively, contained an address or birthdate that did not exactly match voting records; (2) reduced the number of post-election days for absentee voters to cure identification-envelope errors, and the number of days for provisional voters to present valid identification, from ten days to seven days; and (3) restricted the ways in which poll workers can help in-person voters. After conducting a twelve-day trial and authoring a 112-page opinion brimming with sound factual findings and legal conclusions, the district court (Judge Algenon L. Marbley) justly held that all of the challenged provisions imposed an undue burden on the right to vote and violated plaintiffs’ equal protection rights.
In complete .abandonment of the clearly erroneous standard of review, the Majority displaces several of the district court’s well-reasoned and supported factual findings. The Majority’s decision to gut the factual findings of the district court and to advance legal standards without precedent in order to shut the most vulnerable out of the political process must be subjected to *639 the natural antiseptic of sunlight. The unfettered right to vote is the bedrock of a free and democratic society — without it, such a society cannot stand. This right is fundamental. It is the most valuable right a person possesses, because without it, all other rights are meaningless. As history has shown time and time again, laymen and jurists alike have actively worked to deny the right to vote to minorities, in both obvious and obscure ways. The Voting Rights Act (“VRA”),[1] sought to right this wrong by allowing all citizens — unrestrained — to exercise their right to vote regardless of race. While the VRA and Equal Protection Clause sought to bring this nation forward, closer to a society free of racial discrimination, today the Majority’s opinion takes us several steps back. Because the Majority has completely ignored the applicable standard of review and has instead engaged in its own fact finding and reweighing of the evidence in complete disregard for the clearly erroneous standard of review, because the Majority has created a legal standard in contradiction to existing case law based on a ■concurring opinion and dictum, and because the Majority has dishonored the struggle for the right of the most vulnerable to vote, I dissent. I would instead affirm the district court in full.
BACKGROUND
A. Historical Background
1. The Martyrdom and Struggle for Equal Protection
The Majority’s actions must be viewed in full light of their historical context. The murders of countless men and women who struggled for the right to vote and equal protection cannot be overlooked. The utter brutality of white supremacy in its efforts to disenfranchise persons of color is the foundation for the tragedy that is the Majority’s effort to roll back the progress of history. I will not forget. I cannot forget— indeed America cannot forget — the pain, suffering, and sorrow of those who died for equal protection and for this precious right to vote. I add the following publicly available historical statements to humanize the struggle for the right to be equal participants in the democratic process. While the Majority aptly notes that these historical statements do not dictate the outcome of this case, it is imperative that we assess the efforts to undermine the right to vote as an historical operative that did not begin with the Majority’s opinion and unfortunately will not end with it.[2]
*640 [[Image here]]
[Editor’s Note: The preceding image contains the reference for footnotes[3],[4],[5]].
*641 [[Image here]]
[Editor’s Note: The preceding image contains the reference for footnotes [6],[7],[8],[9],[10]],
*642 [[Image here]]
[Editor’s Note: The preceding image contains the reference for footnotes [11],[12],[13],[14]
*643 [[Image here]]
[Editor’s Note: The preceding image contains the reference for footnotes [15],[16],[17],[18],[19]]•
*644 [[Image here]]
[Editor’s Note: The preceding imacontains the reference for footnotes [20],[21],[22],[23], [24]].
*645 [[Image here]]
[Editor’s Note: The preceding image contains the reference for footnotes [25],[26],[27],[28], [29]],
*646 [[Image here]]
[Editor’s Note: The preceding image contains the reference for footnotes [30],[31],[32],[33],[34]
*647 [[Image here]]
[Editor’s Note: The preceding image contains the reference for footnotes [35],[36],[37],[38], [39], [40]].
*648 [[Image here]]
[Editor’s Note: The preceding image contains the reference for footnotes [41],[42],[43],[44] ].
*649 [[Image here]]
[Editor’s Note: The preceding image contains the reference for footnotes [45],[46],[47],[48],[49]
*650 [[Image here]]
[Editor’s Note: The preceding image contains the reference for footnotes [50],[51],[52],[53] ]•
2. The Election of the United States’ First Black President
Another important historical occurrence that cannot be separated from efforts to abridge minorities’ right to vote is the election of the United States’ First Black *651 President. On February 10, 2007, then-Senator Barack Obama of Illinois, an African American, announced his candidacy for the United States Presidency.[54] On November 4, 2008, President Obama became the first African-American President of the United States. President Obama not only captured the presidency, but under his leadership, the Democratic party gained control of the House, the Senate and the White House for the first time since 1995.[55] On April 4, 2011, President Obama announced his reelection for the presidency.[56] On November 6, 2012, President Obama was reelected President of the United States.[57]
B. Factual Background
1. The Parties[58]
Plaintiff, “The Northeast Ohio Coalition for the Homeless” (“NEOCH”), advocates on behalf of the Cleveland homeless, airing and addressing issues related to their lack of housing, employment, and health care. About seventy percent of NEOCH’s in-person homeless applicants are African American. Promoting voting among its members, and among the homeless countywide, is central to NEOCH’s mission, and NEOCH’s executive director, staff, and volunteers expend substantial resources on voting activities in even-numbered years. Executor Director Brian Davis “spends as much as 80 hours per week around the voting registration deadline on such activities, and one part-time NEOCH staff person devotes 20 hours per week to early voting turnout efforts.” Because of the challenged laws, NEOCH would “no longer provide blank cards to its members to vote by mail, but will instead focus [on] ... driving people to the polls to vote, which will divert drivers and vehicles from doing other work on behalf of the organization. ...” This will also require more financial resources.
In describing the impact of the loss of voting to the NEOCH constituency, the district court made the following findings of fact:.
Were NEOCH’s members unable to vote, their bargaining power vis-á-vis elected officials would be diminished, which would in turn diminish NEOCH’s effectiveness at advocating on their behalf, frustrating its mission and exposing an already vulnerable population to further governmental neglect. The homeless constituents of NEOCH and CCH face challenges that hinder them from asserting their own rights, including mental illness and/or addiction, difficulty maintaining a regular address or phone number, limited access to transportation, and illiteracy or lack of education. They also find it challenging to gain entrance to courtrooms and public buildings due to lack of ID, and many home *652 less people have ,a negative relationship with the judicial system or hesitate to get involved in litigation to assert their rights because they are more focused on meeting their immediate needs.
Husted, 2016 WL 3166251, at *7 (citations omitted).
Of the NEOCH homeless members who have voted in primary elections, about eight vote in the Democratic primary for each one who votes in the Republican primary. Id. In describing the impact of SB 205 and SB 216, the district court made the following findings of fact:
[E]ight to ten percent of those living in shelters across Cuyahoga County are absolutely illiterate, and the majority read at only a fourth-grade level. Davis feared that the complexity of the form, along with SB 205’s provisions demanding that voters fill out the required fields completely and accurately ... increased the risk of NEOCH’s members being disenfranchised. In his twenty years working with the homeless, Davis has noticed that homeless persons have pervasive and profound problems filling out the forms. Not being able to read or fill out forms correctly is embarrassing’ and humiliating for many of NEOCH’s members, and they hesitate to ask for help. NEOCH’s practice with other government forms, such as those relating to Social Security disability and Medicaid benefits, is to read the forms aloud and fill them out on the homeless person’s behalf as a matter of course.
Husted, 2016 WL 3166251, at *7 (citations omitted).
Plaintiff, Columbus Coalition for the Homeless (“CCH”), advocates for homeless people in Columbus. Sixty percent of homeless people in shelters in Columbus are African American. Because of the challenged laws, CCH will explain new voting requirements to homeless persons at meetings, publishing articles about the requirements, and train its members to educate other homeless- persons.
Plaintiff, Ohio Democratic Party (“ODP”), is a political party consisting of 1.2 million members; it seeks to advance the interests of the Democratic Party.[59]
Defendant Secretary of the State of Ohio functions as Ohio’s chief election officer. Ohio Rev. Code §§ 3501.04, 3501.05. The State of Ohio is an Intervenor,
2. Voting in Ohio
Absentee Voting. Since 2006, all registered voters have the option to vote absentee without any excuse. To receive an absentee ballot, a voter must provide to the Board of the county in which he or she will vote an application consisting of: (1) the voter’s driver’s license number; (2) the voter’s last four digits of their social security number (“SSN-4”); and (3) an approved form of identification. If these requirements are met, the voter receives an absentee ballot; if these requirements are not met, the voter is notified of the deficiency.
A voter may do “in-person absentee voting” — i.e., vote in-person at their county Board during certain days and hours — or, “mail-in absentee voting,” When mailing the form to the Board, the voter must sign and include in the envelope an affirmation declaring the voter is eligible to vote, and if the voter did not provide a driver’s license number or SSN-4, the voter must provide an acceptable form of identification or current state or federal documents that show the name and address of the voter. If there is an error in any of the five fields, the Board mails a Form 11-S, specifying *653 the type of error and informing the voter that the ballot will not be counted unless certain steps are taken — namely, returning the Form 11-S by a certain time.
Provisional Voting. Voters who cannot confirm eligibility — and so cannot cast a regular ballot — can complete a provisional ballot. This allows the voter to cast provisionally, “subject to later verification.” This type of voting is available to several categories of voters.
3. Challenged Laws
SB 205 — changes to absentee voting procedures
SB 205 mandates that an ID envelope is considered incomplete if the voter does not fill out the five fields of required information (“five-fields requirement”): (1) name; (2) residence address; (3) date of birth; (4) signature; and (5) some form of ID, which includes the types of acceptable ID required for the absentee ballot application form. If these requirements are not met, the voter will receive a written notice informing them of the nature of the defect and that further information must be provided for the ballot to be counted. Before enactment of SB 205, the information contained in the five fields was merely requested, not required. Pursuant to SB 205, if the information is missing, the ballot “shall not be counted.”
The information must be provided no later than the seventh day after the election. This opportunity to cure — i.e., “cure period” — was longer before the enactment of SB 205; voters had ten days rather than seven days to furnish the information.
SB 216 — changes to provisional voting procedures
Before enactment of SB 216, • voters were required to provide only their names, IDs, and signatures in the provisional ballot affirmation form. Pursuant to SB 216, provisional voters must also provide the date of birth and current address. SB 216 also requires voters to print their .names on the provisional ballot envelope. Section 3505.182(F) of the provision already imposed a “completeness requirement.” Section 3505.181(F) provides that persons filling out provisional ballots may receive help, but only if they declare to an election official that they are unable to fill out the ballot due to blindness, disability, or illiteracy,
4. The Lead-Up to SB 205 and SB 216
Following the 2010 election, control of the ' Ohio House of Representatives switched from the Democratic to the Republican Party. “Rather quickly” after that change in leadership, House Republicans introduced two bills: (1) a bill to require all Ohioans to show a photo ID when voting and (2) House Bill 194 (“HB 194”), an expansive election-law bill that included “a number of restrictions on voting, including the restrictions that we see in [SBs 205 and 216].” Representative Kathleen Clyde, Ohio General Assembly person, testified that,the debate over HB 194 was “very partisan and hostile” and “very quick.” HB 194 was ready for the Governor’s signature within two months of its introduction, which Representative Clyde testified marks a significantly shorter time period than usual for the passage of legislation of such complexity. Husted, 2016 WL 3166251, at *13.
In August 2012, in an unprecedented move, the Ohio legislature voted to repeal HB 194 after hundreds of thousands of Ohioans signed petitions to place it on the ballot, for a statewide referendum in November 2012. Sixteen other bills proposing voting restrictions were introduced in the 2013-2014 General Assembly, eight of which passed. One bill.was passed to shorten the window to gather signatures for *654 referenda, which made it more difficult for citizens to put a referendum on the ballot. Another bill was passed making it easier to purge voters from the registration rolls. Senate Bill 238, which eliminated the first week of the early voting period, also was enacted. Other bills were introduced, but not passed, which would have limited voting in the following ways: shortening the early voting period to 14 days; eliminating early voting hours; limiting the mailing of absentee ballot applications to voters and preventing the paying of return postage on absentee ballot envelopes; instituting a photo-ID requirement; and requiring state universities to provide in-state tuition rates to students if they provided those students with ID that they needed to vote.
None of the proponents of SB 205 cited voter fraud as a justification for the bill. Husted, 2016 WL 3166251, at *13. During the floor debate of SB 205, in contrast to most proposed legislation, there was no data or testimony offered about the need for the measures proposed in SB 205. Id. During committee debate, Representative Matt Huffman, speaking in favor of SB 205, asked “should we really be making it easier for those people who take the bus after church on Sunday to vote.” Id. With respect to both SB 205 and SB 216, Democratic legislators spoke about their concerns that the provisional and absentee ballots of African-American voters would be thrown out disproportionately. Id. at *14.
As to the cure period, one Board official testified that before the challenged laws went into effect, voters did come in during the eighth, ninth, and tenth days of the cure period to cure them provisional and absentee ballots. Because the Board can receive absentee ballots up until ten days after Election Day, yet the cure period is only seven days, some voters to whom the Board sends a Form 11-S notifying them of their need to cure their ballot will not receive it in time to do so. Id. at *17.
5. Information Requirements
The vast majority of NEOCH’s individual homeless members plan to participate in the 2016 general election. Many of CCH’s members also plan to vote. Many of the organization’s members are illiterate, barely literate, and/or mentally ill. A CHH witness testified that without assistance, a homeless person could not complete the entire form and that due to the complexity and amount of print on the form, some homeless people would just tear it up and say, “you know, to hell with it.” Forms that are, in the words of one Board official, “pretty complex,” with “a lot of wording, a lot of stuff crammed into” them, can confuse even educated, literate voters.
6. Prohibition Against Poll-Worker Assistance
The district court found that the prohibition against poll-worker assistance burdens persons with low literacy, particularly if they are embarrassed to reveal their illiteracy due to the stigma it entails. Plaintiffs introduced ample evidence that many of them members fall into this category. and that illiteracy or low literacy levels are prevalent among the homeless. Homeless voters suffer disproportionately from disabilities, including mental illness, which can also hamper their ability to fill out forms. About a third of the homeless individuals with whom NEOCH works have a mental disability, forty-five to fifty percent read at a fourth-grade level, and eight to ten percent are completely illiterate. They may write poorly and have handwriting that is difficult to read or, due to mental illness, they struggle to focus on basic tasks without help. All of these issues combine to create difficulties for homeless voters in filling out forms without assis *655 tance like the absentee ID envelope and the provisional ballot affirmation. Moreover, NEOCH Executive Director Brian Davis testified that in his experience with voter mobilization of homeless people in 2014, Board staff members were more hesitant to engage with voters and offer help when it appeared to be necessary and that homeless voters have been more likely to make mistakes because of the lack of help. Secretary Husted failed to conduct any review or testing of the effect of the provisional ballot affirmation or the absentee identification envelope on voters with low literacy, despite a suggestion to do so from the League of Women Voters. In sum, the district court concluded that, many homeless people face , vexing and profound obstacles in exercising the basic right to vote, and the prohibition against poll-worker assistance is likely to exacerbate the problem.
ANALYSIS
A. The Majority Applies the Wrong Standard of Review for Factual Findings
By applying the wrong standard of review, the Majority abandons its role as a court of appellate review and plays the role of the trier of fact. I cannot join this flawed approach.
“On an appeal from a judgment entered after a bench trial, [this court] review[s] the district court’s ... conclusions of law de novo.” Lindstrom v. A-C Prod. Liab. Trust, 424 F.3d 488, 492 (6th Cir. 2005). “Mixed questions of law and fact are also subject to de novo review.” T. Marzetti Co. v. Roskam Baking Co., 680 F.3d 629, 633 (6th Cir. 2012) (citing Thoroughbred Software Int’l, Inc. v. Dice Corp., 488 F.3d 352, 358 (6th Cir. 2007)). A district court’s findings of fact are reviewed for clear error. Lindstrom, 424 F.3d at 492. “A finding of fact will only be clearly erroneous when, although there may be some evidence to support the finding, ‘the reviewing court on the entire evidence is left with the definite and firm conviction that-a mistake has been committed.’” Roskam Baking Co., 680 F.3d at 633 (quoting United States v. Darwich, 337 F.3d 645, 663 (6th Cir. 2003)). “If the district court’s account of the evidence is plausible in light of the entire record, this court may not reverse that accounting, even if convinced that, had it been sitting as trier of fact, it would have weighed the evidence differently.” Id. (quoting Harlamert v. World Finer Foods, Inc., 489 F.3d 767, 771 (6th Cir. 2007)). “This is so- even when the district- court’s findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts.” Id. (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)).
“In reviewing factual findings for clear error, ‘the reviewing court must give due regard to the trial court’s opportunity to judge the witnesses’ credibility.’” Calloway v. Caraco Pharm. Labs., Ltd., 800 F.3d 244, 251 (6th Cir. 2015) (quoting Fed. R. Civ. P. 52(a)(6)). “[This court] cannot find that the district court committed clear error where there are two permissible views of the evidence, even' if we would have weighed the evidence differently.” Id. (quoting King v. Zamiara, 680 F.3d 686, 694 (6th Cir. 2012)).
Here, the district court took great lengths to make well reasoned and supported factual findings. Indeed, the district court’s findings of facts were the product of several years of litigation and a twelve-day bench trial. The findings alone span over fifty pages in length. The findings are supported by statistical, empirical, and testimonial evidence after research was conducted regarding thousands of voters over several years of voting cycles. These find *656 ings of fact are critical to analyzing the claims brought pursuant to the Voting Rights Act -and the Equal Protection Clause. Some of the most relevant findings of. the-district court are as follows:
• Across all even-numbered election years, minorities use provisional ballots more often than whites, and in presidential election years, the absentee ballots and provisional ballots of minority voters are more likely to be rejected than those of white voters.
• African-Americans were hindered from participating in the political process.
• Ohio Has a history of racially discriminating vdting laws.
• Racially polarized voting in Ohio is extensive.
• There are racialized appeals in politics.
• African-Americans are still not represented well in the most important and visible elected statewide posts.
• There is a lack of responsiveness to the particularized needs of African-American voters.
Yet, the Majority largely ignores these findings and instead applies a de novo standard of review. While the Majority asserts that it is not applying a- de novo standard of review, careful review of the Majority opinion reveals that it indeed does. For instance, the Majority- took note of the district court’s conclusion that “African-American voters are more likely than white voters to have their absentee or provisional ballots rejected.” “A district court’s conclusion that a challenged electoral practice has discriminatory effect is a question of fact subject to review for clear error.” Ortiz v. City of Philadelphia Office of City Com’rs Voter Registration, 28 F.3d 306, 308-09 (3rd Cir, 1994) (citing Thornburg v. Gingles, 478 U.S. 30, 79, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986)). Yet, the Majority disagreed with this factual finding merely because it sees the record differently. The Majority fails to demonstrate (or even assert) that the district court’s factual findings are not “plausible in light of the entire record.” See Roskam Baking Co., 680 F.3d at 633 (“If the district court’s account of the evidence is plausible in light of the entire record, this court may not reverse that accounting, even- if convinced that, had it been sitting as trier of fact, it would have weighed the evidence differently.”) (emphasis added). The Majority did exactly what the Supreme Court has repeatedly said we cannot do, “reverse the finding of the trier of fact simply because it ... would have decided the case differently.” See Anderson, 470 U.S. at 573, 105 S.Ct. 1504. The clear error standard of review “plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently.” Id. We must be mindful that because we are a court of appellate review, we do not decide factual issues de novo. See id. “Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be clearly erroneous.”[60] Id. at 574, 105 S.Ct. 1504.
*657 Because the standard of review is the lens through which courts analyze a particular issue, the Majority’s application of the incorrect standard infects its entire analysis. I cannot join the Majority in its blatant disregard for the standards that guide this court.
B. Because the Majority applied the wrong standard of review — engaging in a de novo review of the facts — and because the district court did not clearly err in finding that SB 205 and 216 disparately impacted African American voters, the district court’s findings of fact and legal conclusions on Plaintiffs’ VRA claims should be affirmed.
The Supreme Court has instructed that the Voting Rights Act “should be interpreted in a manner that provides ‘the broadest possible scope’'in combating racial discrimination.” Chisom v. Roemer, 501 U.S. 380, 403, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991) (quoting Allen v. State Bd. of Elections, 393 U.S. 544, 567, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969)). In vote-denial cases, courts conduct a two-part analysis. See League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 240 (4th Cir. 2014). First, a court determines whether a practice or procedure has a disparate impact on a minority group. See Thornburg v. Gingles, 478 U.S. 30, 44, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). Second, if it finds disparate impact, the court assesses whether the “electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.” Id. at 47, 106 S.Ct. 2752. In applying the test, the court considers “the totality of circumstances.” 52 U.S.C. § 10301(b).
1. Disparate Impact
Here, the district court did not commit clear error in finding “SB 205 and SB 216 have a disproportionate impact on African-American voters in Ohio, creating greater risk of disenfranchisement of African-Americans than whites.” Husted, 2016 WL 3166251, at *47. The district court further concluded that “[t]he burdens imposed on voters by .the five-field requirement, the prohibition on poll-worker assistance, and the reduced cure period fall more heavily on African-Americans than whites.” Id.
The Majority contravenes-a clearly erroneous standard of review by reweighing and reassessing the evidence to reach the conclusion that African American’s are not disparately impacted by the new legislation. After years of litigation, a twelve-day trial, and painstakingly combing the record, the, district court found that Dr. Tim-berlake’s data on disparities in provisional and absentee ballot usage and rejection rates reveal that higher minority population share is correlated to higher rates of absentee ballot rejection and provisional ballot usage and rejection. Husted, 2016 WL 3166251, at *47. In support of its conclusion, the district court cited the following findings of fact:
[T]he Court credits Dr. Timberlake’s findings that: (1) in the presidential election years of 2008 and 2012, where minority turnout was higher than during typical midterm elections, minorities’ absentee ballots were rejected at a higher rate than whites'; (2) in 2008, 2010, 2012, and 2014, minorities cast provisional ballots at a higher rate than whites; [This finding is also corroborated by studies upon which Dr. Timberlake relied that showed that African-American voters use provisional ballots at a higher *658 rate than white voters nationwide. (See Timberlake Rebuttal Rpt., P-1195 at PTF-243.) ] and (3) in 2008, 2010, and 2012, minorities had higher rates of rejection of provisional ballots than whites.
Husted, 2016 WL 3166251, at *48 (emphasis added).
The district court therefore concluded that “because of the passage of the challenged laws, African-American voters are more likely than white voters to have their absentee or provisional ballots rejected.” Id. Despite the district court’s well-reasoned findings, the Majority reinterprets and reweighs the evidence to conclude that Dr. Timberlake’s findings do not support the conclusion that minorities are disparately impacted by the challenged laws.
In so doing, the Majority makes much of the decrease in the use of absentee ballots in the 2012 and 2014 elections. However, again the Majority avers where the district court directly addressed the argument in a manner that was not clearly erroneous. Totally disregarding the district court’s factual determinations and explanations, the Majority discounts the district court’s explanation for the decrease in absentee ballots: “Plaintiffs presented evidence that the gubernatorial election was significantly less competitive in 2014 than in 2010, that overall turnout was lower in 2014 than 2010.” Husted, 2016 WL 3166251, at *48. Given this plausible explanation, the district court did not clearly err.
Further, under either standard of review, the Majority’s analysis still falls short. The Majority’s reasons for rejecting the district court’s factual findings are unavailing because the reasons suffer from at least three major analytical flaws. First, the Majority misinterprets the evidence. Second, the Majority fails to apply a totality of the circumstances standard. Third, the Majority errs in its conclusion regarding the undue burden.
First, the Majority misinterprets the evidence. For example, the Majority reasons as follows:
[Tjhere is scant evidence in the record that minority voters are more likely to cast absentee ballots than white voters. It would therefore be illogical to infer that rejecting absentee ballots for failure to accurately complete address and birthdate fields disproportionately affects minority voters without some other evidence that minority voters are less likely to fulfill that requirement. And ... the vast majority of absentee-ballot rejections are for reasons other than those challenged here.
By relying on the “scant evidence” that minority voters are more likely to cast absentee ballots than white voters, the Majority again misses the mark. While evidence that minorities avail of a voting practice more frequently than whites can support a Section 2 claim, it is not a necessary component for such a claim; minority voters may only show that they are more likely to have their ballots rejected than white voters because of the new requirements, which means they have “less opportunity than” white voters to exercise their right to vote. See Chisom, 501 U.S. at 395, 111 S.Ct. 2354.
Second, the Majority applies the wrong legal test by considering the impact of each individual legislative change, rather than considering the disproportionate impact that the new Ohio voting requirements have on minorities as a whole. The Majority engages in a piecemeal freeze frame approach to the evidence finding that each new requirement alone in a vacuum does not meet the standard for disparate impact. Even faced with evidence that minority absentee ballots are, rejected more frequently than white absentee bal *659 lots, the Majority asserts that this distinction means nothing unless there is “some other evidence” that minority voters are less likely to correctly fill out the birthdate and address requirements. The Majority’s requirement that the plaintiff must establish the disproportionate impact of each requirement imposes too great a burden. This approach does not comport with Section 2’s mandate to consider the “totality of the circumstances.” Indeed, at least one circuit has cautioned against the very approach the Majority takes here. See League of Women Voters of North Carolina v. North Carolina, 769 F.3d 224, 245 (4th Cir. 2014).
In League of Women Voters, the challenged house bill contained several new “electoral mechanisms.” Id. at 242. That house bill, among other things, “imposed strict voter identification requirements, cut a week off of early voting, prohibited local election boards from keeping the polls open on the final Saturday afternoon before elections, and eliminated same-day voter registration.” Id. at 228. The district court analyzed each challenged electoral mechanism separately. Id. at 242. But the Fourth ■ Circuit criticized the district court for “inspecting the parts of [the] [bill] as if they existed in a vacuum.” Id. at 242. Specifically, the district court “failed to consider'the sum of those parts and their cumulative effect on minority access to the ballot box.” Id. “Doing so is hard to square with Section 2’s mandate to look.at the ‘totality of circumstances.’ ” Id. (emphasis added) (quoting 52 U.S.C. § 10301(b)). We should be mindful that “a panoply of regulations, each apparently defensible when considered alone, nevertheless have the combined effect of severely restricting participation....” Id. (quoting Clingman v. Beaver, 544 U.S. 581, 607-08, 125 S.Ct. 2029, 161 L.Ed.2d 920 (2005) (O’Connor, J., concurring in part and concurring in the judgment)). The Majority’s approach creates the incentive for state legislatures to pass numerous electoral mechanisms so that courts are forced to put on blinders when it comes to understanding the combined effect of these mechanisms.
Third, the Majority errs in its conclusion regarding the undue burden. The Majority states that no undue burden exists because there was no evidence that voters received additional poll-worker assistance before the new requirements. However, disparate impact does not require such exact mathematical quantification. It is enough that there is a high likelihood of such assistance being needed given the interplay of structural inequalities with the challenged provisions as the district court correctly found under the governing standard. The Majority has not and cannot cite any legal precedent for such exacting standards, numbers, or data — nor should any be required. The Majority acknowledges that race is., not recorded on ballots, but uses this absence of required information to make the self-invalidating argument that finding racial impact is impossible/ This deft maneuver again contravenes the standard of review. Such reasoning and stealth of hand sets a very dangerous precedent.
1, therefore, dissent from the Majority’s finding that the district court erred in finding that the Plaintiffs satisfied the first prong of their vote denial claim — disparate impact — and would affirm.
2. Social and Historical Conditions
Furthermore, the district court’s findings of fact with respect to the second prong — social and historical conditions— were a product of the district court’s careful application of the so-called “Senate” factors or “Cingles” factors,[61] The factors *660 from Thornburg v. Gingles, 478 U.S. 30, 79, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986) “might be probative” of a Section 2 violation. See Michigan State A. Philip Randolph Inst. v. Johnson, No. 16-2071, 833 F.3d 656, 666-67, 2016 WL 4376429, at *7 (6th Cir. Aug. 17, 2016). The factors include:
(1.) the extent of any history of official discrimination ' in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democrátic process;
(2.) the extent to which voting in the elections of the state or political subdivision is racially polarized;.
(3.) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
(4.) if there is a candidate slating process, whether the members of the minority group have been denied access to that process; ;
(5.) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
(6.) whether political campaigns have been characterized by overt or subtle racial appeals;
(7.) the extent to which members of the minority group have been elected to public office in the jurisdiction;
(8.) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and
(9.) whether the policy underlying the state or political subdivision’s use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.
See Gingles, 478 U.S. at 36-37, 106 S.Ct. 2752. The district court made findings on all but the fourth factor. I summarize below.
Analyzing factors one and three together, the district court noted the strong history of “Ohio’s racially discriminatory voting laws.” Although the district court noted the history of Ohio’s racially discriminatory voting practices from several decades ago, it also discussed recent discriminatory bills passed after the 2008 election.
As to the second factor, the district court noted that exit polls from Ohio voters in the 2012 presidential election suggest significant and substantial patterns of racially polarized voting. “Approximately, 41% of white voters and 96% of African-Americans reported voting for President Barack Obama — an enormous differential.”
As to the fifth Senate factor, the district court noted the barriers faced by African Americans to participation in the political process. Indeed, the district court noted that persistent levels of discrimination faced by African Americans in “employment, housing, income, education and health.”
*661 As for factor six, the district court found that there are racialized appeals in politics in Ohio. Such appeals “serve to discourage or dissuade minority voters and prospective candidates by reinforcing the message that they simply do not belong in the political process and/or by mobilizing white voters in a particular direction by playing on insidious, sometimes explicit and sometimes implicit, stereotypes.” The district court further cited as examples racialized statements made by public officials and referred to disparaging commercials.
Nor was the district court convinced that there was minority representation in Ohio (factor seven). As an example, no African American presently holds the position of Governor, Lieutenant Governor, Attorney General, Auditor, Secretary of State, and State Treasurer. African Americans have occupied each of these positions only five times in the history of the State. Until recently, and for the first time in sixty years, the Governor’s twenty-six-person cabinet was entirely white.
As to factor eight, the district court found that not many of the “socioeconomic disparities have improved in recent years,” demonstrating Ohio’s lack of responsiveness to the particularized needs of African-American Ohioans. Disparities in unemployment have remained steady as well. Finally, as to factor nine, the district court found that Ohio’s primary justification for the challenged laws at issue is that the they improve “election administration,” but those justifications were tenuous.
Because Ohio does not challenge any of the district court’s factual findings pursuant to Gingles on appeal, those factual findings are binding on this panel. McElwee v. Wharton, 7 Fed.Appx. 437, 438 (6th Cir. 2001) (“The district court’s unchallenged factual findings ... are binding on this Court.”) (per curiam); see also Shields v. Reader’s Digest Ass’n, Inc., 331 F.3d 536, 542 (6th Cir. 2003) (“[Because [the] [p]laintiff has not directly challenged the district court’s factual conclusions ... all factual controversies are deemed abandoned on appeal and the district court’s factual findings are hereby upheld.”).
While the Majority never reaches the issue because it holds that Plaintiffs’ Section 2 claim fails in its infancy, a careful review of the district court’s factual findings pursuant to Gingles reveals that the challenged practice is “caused by or linked to ‘social and historical conditions’ that have or currently produce discrimination against members of the protected class.” See Michigan State A. Philip Randolph Inst. v. Johnson, No. 16-2071, 833 F.3d 656, 667, 2016 WL 4376429, at *8 (6th Cir. Aug. 17, 2016) (“The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.” (quoting Thornburg v. Gingles, 478 U.S. 30, 47, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986))). Accordingly, I would affirm the district court’s holding with respect to the Section 2 Voting Rights Act claim.
Furthermore, I would affirm the district court’s findings with respect to both prongs of the vote denial claims as they apply to the restrictions on poll workers and the reduced time to cure. In support of its findings of vote denial on the poll worker restrictions and the reduced time to cure, the district court stated the following:
Because low literacy levels are also correlated with substandard education (Timberlake Tr., Vol. 5 at 73), and the Court has credited .Dr. Timberlake’s findings that African-Americans suffer from lower educational attainment than whites in Ohio, the Court concludes that *662 African-Americans would also suffer from higher costs associated with the five-field requirement and the prohibition on poll-worker assistance because they would face disproportionately more challenges filling out the forms. Because African-Americans move more frequently than whites, they may be more likely to be forced to vote provisionally. (Id. at 67-68; see also Hood Tr., Vol. 10 at 121, 124.) They are also more likely to be homeless. (Davis Tr., Vol. 4 at 186.) And because they are more likely to have inflexible schedules or lack access to a car, they are more likely to be burdened by a shorter cure period for absentee and provisional ballots. (Timberlake Tr., Vol. 5 at 61-62.) All of these effects of discrimination against African-Americans combine to create an inequality in their opportunities to participate in the political process.
Husted, 2016 WL 3166251, at *52.
Given these structural inequalities and the impact of the poll worker restrictions and the shortened cure period, the district court did not clearly err,
C. The Majority Fundamentally Misunderstands the Concept of Disparate Impact
Additionally, the Majority fundamentally misunderstands the concept of disparate impact. A particular practice has a disparate impact on persons of a protected class when that practice has a “disproportionate” impact on the members of the protected class. See, e.g., Alexander v. Local 496, Laborers’ Intern. Union, 177 F.3d 394, 419 (6th Cir. 1999) (“In a so-called ‘disparate impact’ case, the plaintiffs need not prove that the defendant intended to discriminate; instead, plaintiffs must prove that a particular [ ] practice, although neutral on its face, has caused a disproportionate adverse effect on a protected group.”) (emphasis added); Chrisner v. Complete Auto Transit, Inc., 645 F.2d 1251, 1257 (6th Cir. 1981).
In some instances, after simply counting the number of persons affected by the new Ohio voter identification laws, without making any comparisons between minority and non-minority voters to assess the dis-proportionality of those numbers, the Majority concludes that the voting practices in Ohio do not have a disparate impact because only a small number of voters are affected by the new laws. Disproportionality, by definition, requires assessing racial disparities. See Alexander, 177 F.3d at 419 (noting that “statistical evidence is not absolutely essential in proving a disparate impact case,” but there “must be proof of disparity using the proper standards of comparison”). By relying on the sheer number of voters affected by the law in isolation, without making any relevant comparisons, the Majority fads to engage in any disparate impact analysis at all. The Majority merely engaged in a counting exercise that gets us nowhere in terms of analyzing the discriminatory impact of a rule or practice.
Next, the Majority concludes that “[a] law cannot disparately impact minority voters if its impact is insignificant to begin with.” The .text of the Voting Rights Act itself proves this statement to be false. Section 2 of the Voting Rights Act provides, in relevant part, that a violation is established if:
... based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in *663 the political process and to elect representatives of their choice.
Chisom v. Roemer, 501 U.S. 380, 395, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991) (quoting Sect. 2, Voting Rights Act). Tellingly, the Majority-cites no legal authority for the proposition that in order for a practice to be . discriminatory, its “impact” must also be “significant.” Quite simply, a violation of Section 2 of the Voting Rights Act does not turn on whether people are being discriminated against in “significant” numbers, it turns on whether minorities have “less opportunity than” non-minorities to vote. See id.[62] Moreover, although the ballots of minorities and the homeless may be insignificant to the Majority, they are not insignificant to the basic principles of the VRA, which does not require a certain number of affected persons, but looks instead at the impact on minorities as compared to non-minorities.
D. The Majority Applies the Wrong Legal Standard for the Equal Protection Claim
With respect to the Equal Protection Clause claim, I agree with the Majority’s implicit rejection of Ohio’s argument that rational-basis review applies. I further agree that the Anderson/Burdick balancing test applies instead. But the Majority’s application of the test cannot be reconciled with Sixth Circuit precedent. The Majority takes issue with the district court’s consideration of the burdens imposed by the challenged provisions on NEOCH’s and CCH’s homeless members. The Majority relies in part on Justice Scalia’s concurrence in Crawford v. Marion Cty. Election Bd., 553 U.S. 181, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008), which states that “what petitioners view as the law’s several light and heavy burdens are no more than the different impacts of the single burden that the law uniformly imposes on all voters.” See Crawford, 553 U.S. at 205, 128 S.Ct. 1610 (Scalia, J. concurring in judgment) (second emphasis added). The Majority then proceeds to “consider the burden that the provisions place on all Ohio voters.” (Emphasis added).
The Majority’s approach is incorrect. In Crawford, a plurality of the Supreme Court held that an Indiana statute that required citizens voting in person on election day or casting in person a ballot before election day was constitutional. Crawford, 553 U.S. at 185, 204, 128 S.Ct. 1610. We have previously held that Justice Stevens’ opinion is controlling for Marks[63] purposes, see Obama for America v. Husted, 697 F.3d 423, 441 n.7 (6th Cir. 2012) (“OFA”), and Justice Stevens, quite simply, did not make the same assertion that Justice Scalia made. See also Ohio State Conference of N.A.A.C.P. v. Husted, 768 F.3d 524, 544 (6th Cir. 2014), vacated sub nom. Ohio State Conference of The Nat. Ass’n For The Advancement of Colored People v. Husted, No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014) (“A majority of the justices in Crawford either did not expressly reject or in fact endorsed the idea that a burden on only a subgroup of *664 voters could trigger balancing review under Anderson-Burdick.”).
In Crawford, a plurality of the Supreme Court acknowledged that, although for most voters it is not a substantial burden to comply with a photo ID requirement, a “somewhat heavier burden may be placed on a limited number of persons .,. in-clud[ing] elderly persons born out of State, who may have difficulty obtaining a birth certificate!;,] homeless persons[,]” and others. 558 U.S. at 198-99, 128 S.Ct. 1610. Although the Crawford Court rejected the plaintiffs’ argument that the law should be enjoined on the basis of the burden to that smaller group of voters, it did so because the record in that case did not contain evidence of the specific burdens imposed on those vulnerable groups. Id. at 201-02, 128 S.Ct. 1610. Because the record was virtually devoid of evidence that would have allowed the Court to measure the “magnitude of the burden on this narrow class of voters or the portion of the burden imposed on them that is fully justified,” id. at 200, 128 S.Ct. 1610, the Court considered only the’ burden on all Indiana voters, which it determined was only “limited.” Id. at 203, 128 S.Ct. 1610.
That the Majority here has decided to pluck one line from Justice Scalia’s concurrence to identify the appropriate legal test for analyzing Plaintiffs’ equal-protection claim, is deeply misguided. The Majority, as a result, applies the wrong standard. Under the Majority’s approach, no longer must we inquire as to how a voting regulation affects different groups of people— something I thought was the cornerstone of equal-protection jurisprudence. Instead, we must inquire whether a voting regulation burdens everyone, and only when it does, will that regulation be deemed unequal. This conclusion defies both logic and common sense.
Even if simple logic did not counsel against the Majority’s approach, then our circuit precedent surely does. See OFA, 697 F.3d at 431. In OFA, the challenged regulation in effect reduced the number of days available for in-person voting by three days. Id, This court concluded that the district court did not clearly err in finding that “early voters, who have disproportionately lower incomes and less education than election day voters,” were burdened by the challenged regulation. Id. Put another way, this court studied the impact of the challenged law on certain groups^ See id. Quite simply, despite the Majority’s assertions that a law must impact everyone for it to violate the Equal Protection Clause, Crawford does not dictate or mandate such an analytical framework.
In sum, I would use the Anderson/Bur-dick balancing test to examine whether Ohio’s interests outweigh the burdens imposed on Ohioan homeless individuals[64] on the basis of, the three new requirements: (1) the birthdate and address forms requirement; (2) the reduction in the cure period; and (3) the restrictions on poll-worker assistance. As to the first requirement, the Majority and I are in agreement that the address and birthdate forms requirement violates the Equal Protection Clause, even though I disagree with the Majority’s analytical approach in reaching that conclusion. Nevertheless, because the first requirement is not a point of contention, I focus on the remaining two.
Reduction in cure period. The district court ruled that the reduction of the cure period, for absentee voters, would be “es *665 pecially burdensome for voters with low literacy who may need to seek assistance in reading the Form, 11-S[65] and, filling it out before returning it to the Board,” Thus, “[l]imiting the window in which they may cure a deficient ballot imposes a significant burden on homeless, impoverished, and illiterate voters.”[66] Husted, 2016 WL 3166251, at *39. For provisional voters, “the opportunity to cure ... ballots is limited to providing. ID that they failed to provide when they voted....” Id. at *18,
Ohio characterizes the limitation as an “inconvenience” that does not constitute a burden. Ohio cites numerous' testimonies indicating that few individuáis avail of the cure-period in any case, and further, “Plaintiffs identified no person harmed by the three-day difference.” In proffering an interest, Ohio states that the reduction serves to provide a “workable stopping point before election officials must begin the official canvas” eleven days after Election Day. The district court -was not persuaded by the interest. “Of the twenty-one Board officials who testified at trial, not one indicated that he or she had experienced any inconvenience or increased cost during the pre-2014 ten-day cure period, or stated that the county Board needed extra time between the conclusion of the cure period and the start of the canvass to address any particular matters.” No board official mentioned any “specific task[ ] that needed to be conducted between the end of the cure period and the beginning of the canvass.”
Ohio contends that because the cure period was rarely used, reduction of that period was justified. But that argument cuts the other way — if that period was rarely used, then it would not matter if the cure period remained at ten days rather than at seven days. Given that no board official testified that a “specific task” needed to be conducted before the canvas, it appears that Ohio has not struggled to cope with a ten-day cure period. In these circumstances, Ohio has not shown that its interest outweighs the burdens imposed. See OFA, 697 F.3d at 434 (“With- no evidence that local boards of elections have struggled to cope with early voting in the past, no evidence that they may struggle to do so during the November 2012 election, and faced with several of those very local boards in opposition to its claims, the State has not shown that its regulatory interest in smooth election administration is ‘important[.]’ ”). It should be noted that defendant bears the burden of justification. Because the defendant failed to meét even the minimum threshold of that burden, the district court did not clearly err.
The Majority says that there is no need for Ohio to wait for a problem to arise in the last three days of the cure period in order to act; however, that analysis misses the point. If there was no problem in the last three days, the action lacks any justification under any standard of review..Lacking any justification, the district court’s findings were simply not erroneous.
Prohibition against poll-worker assistance. We must “weigh the character and magnitude of the asserted injury to the” protected rights against “the precise interests put forward by the State as justifications for the burden imposed by its rule.” *666 See Burdick v. Takushi, 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). The district court made careful factual findings that Plaintiffs’ constituents were illiterate, barely literate, or suffering from disability or mental illness,- which limited their ability to complete basic voting-related tasks. Although it is true that illiterate and disabled workers may receive assistance in filling out the form, an official testified that “Board staff members were more hesitant to engage with voters and offer help when it appeared to be necessary.” Thus, in light of the district court’s crediting this testimony, the district court’s finding that the limitation of poll-worker assistance was burdensome is not clearly erroneous. The district court then found lacking the State’s justifications for preventing poll workers from assisting voters who do not affirmatively ask for help because they are illiterate or disabled. Husted, 2016 WL 8166251, at *39. The district court’s findings were not clearly erroneous.
A close reading of the Majority’s opinion reveals that the Majority’s calibrations are misaligned. On the one hand, the Majority concludes that because there is no evidence of voter fraud, Ohio’s asserted interest in protecting against voter fraud does not outweigh the burden placed on the voters by the address and birthdate requirements. Yet in the same breath, the Majority concludes that “Ohio’s legitimate interest in minimizing election-official mistakes by ensuring that they are not overburdened and do not fill in others’ personal information justifies the limitation placed on poll-worker assistance” even though there is no evidence that the poll workers were overburdened or that there were problems with others filling in personal information.[67]
Moreover, the Majority reiterates that the impact on voters- is small and insignificant. However, the Majority fails to cite any legal precedent that mandates a certain mathematical quantum because none is required. Furthermore, the complete lack of sensitivity and unbridled privilege with which the Majority exercises its view of the trivial is exactly what led to the constitutional and statutory protections at issue in this case. Still further, as I have stated throughout this dissent, the stakes of these proceedings are hardly small, insignificant, or trivial; instead, the impact is worthy of. countless hours of the Ohio congressional time, energy, and efforts in not only passing these restrictive measures, but defending them. The rush to set forth and pass these measures belies any claim that what is at stake is slight, minor, unimportant, trifling, trivial, insignificant, inconsequential, negligible, nugatory, or infinitesimal. Similarly, the Majority continues to point out that the vast Majority of challenged ballots are struck for reasons that do not involve SB 205 and 216; however, our inquiry is the impact on those voters whose ballots SB 205 and 216 does disparately affect.
In sum, because I conclude that the burdens of the challenged laws outweigh the government’s purported interests under the Anderson/Burdick balancing test, I would affirm the district court’s judgment in favor of Plaintiffs with respect to the Equal Protection Clause claim.
CONCLUSION
The Majority applies the wrong legal tests, misapprehends the basic concept of *667 disproportionality, and applies the wrong standard of review. Most disturbingly, the Majority substitutes its own view of the record for the carefully decided and supported factual findings of the district court. As the Supreme Court has cautioned, a “reviewing court oversteps the bounds of its duty ... if it undertakes to duplicate the role of the lower court.” Anderson, 470 U.S. at 573, 105 S.Ct. 1504.'“The trial judge’s major role is the determination of fact, and with experience in fulfilling that role comes expertise.” Id. at 574, 105 S.Ct. 1504. “[Pjarties to a case on appeal have already been forced to concentrate their energies and resources on persuading the trial judge that their account of the facts is the correct one; requiring them to persuade three more judges at the appellate level is requiring too much.” Id. at 575, 105 S.Ct. 1504. Today, the Majority disregards the Supreme Court’s well-established principles and substitutes its own view of the record for the carefully decided and supported factual findings of the district court.
The birth of this Nation was founded upon the radical principle that we, as a people, would govern ourselves. And voting is the ultimate expression of self-government. Instead of making it easier for all persons, unrestrained and unfettered, to exercise this fundamental right to vote, legislators are making it harder. States are audaciously nullifying a right for which our ancestors relentlessly fought and — in some instances — even tragically died. From that struggle came the Equal Protection Clause of the Fourteenth Amendment, and later, the Voting Rights Act. It is this court’s responsibility to enforce both the Constitution and the statute, and thereby safeguard this precious right to vote. In my opinion, the Majority has failed to do just that. The Majority takes the position that unless a rule affects non-minorities, it does not run afoul of the Equal Protection Clause of the Fourteenth Amendment. This baffling position distorts the Equal Protection Clause so much so that the -clause becomes unrecognizable, unenforceable, and fundamentally, unequal. For years, states have been (both stealthily and overtly) erecting hurdles to the right to vote. And the votes of those who are actually able to surmount those hurdles are often diluted through Gerrymandering. These states’ actions of implementing rules and redrawing districts in an effort to restrict minorities’ access to the ballots is another reminder that history repeats itself. It is yet another reminder that many people hold the misguided belief that only the privileged majority should be granted access to political power and adequate representation.
With every gain in equality, there is often an equally robust and reactive retrenchment. We must never forget that constant dialectical tension. For every action, there is a reaction. The Majority’s decision is a fateful reminder that we can never fool ourselves into believing that we have arrived as a nation. Our decision today, and more decisions like this one, will undoubtedly shape the future of this Nation because deciding who gets to vote inevitably affects who will become our leaders — a determination that is grounded in the principles long cherished and long pursued by our Founding Fathers. This is exactly why so many are actively seeking to etch away at the right to vote in assembly halls across this nation. These efforts are hardly insignificant or negligible. They are, for their proponents, necessary and highly deliberate. It is my hope that when future generations look back on these decisions, they conclude that we were on the right side of history. But today I fear that we were not.
For these reasons, I cannot concur with my colleagues in full. In the interest of clarity, I would affirm the district court *668 and permanently enjoin the enforcement of portions of SB 205 and 216 that: require boards to reject the ballots of absentee and provisional voters who do not accurately complete the address and birthdate fields; reduce the cure period to seven days;, prohibit most forms of poll-worker assistance; and require provisional voters to print them names on the affirmation form..

. 52U.S.C.A. § 10301 etseq.

. I give full context to the legal analysis of the issues presented in this case as well as full historical contextualization of the facts. The following pictures and synopses cannot capture the full horror of those who lost their lives in the quest for equal protection and voting rights. The following is a mere fraction of the martyrs of the struggle for equality. The assaults, rapes, murders, lynching, and utter travesty of the struggle for equality can never be fully captured in words or pictures. The Southern Poverty Law Center sustains a memorial for these individuals, and much of the following information can be found on their website: https://www.splcenter.or§ywhat-we-do/civil-rights-memorial/civil-rights-martyrs (last visited September 12, 2016).

. See ICC. Meclcfessel Taylor, Marielle Elisa-bet Dirkx, William Mcintosh, W. Tucker & Carrington, CSI Mississippi: The Cautionary Tale of Mississippi's Medico-Legal History, 82 Miss. L.J. 1271, 1272 (2013).

. Paula C, Johnson, Voting Rights and Civil Rights Era Cold Cases: Section Five and the Five Cities Project, 17 Berkeley J. Afr.-Am. L. & Pol’y 377, 384 (2015).

. Id.

. Ronald Turner, Remembering Emmett Till, 38How. L.J. 411, 415 (1995).

. Id, at 417 (citing William Bradford Huie, The Shocking Story of Approved Kitting in Mississippi, Look, Jan. 24, 1956, at 50).

. Id. at 419.

. Adam Nossiter, Murder, Memory And the Klan; A Special Report: Widow Inherits a Confession To a 36-Year-Old Hate Crime, N.Y. Times, Sept. 4, 1993, at' 1, available at http:// www.nytimes.com/1993/09/04/us/murder-' memory-klan-special-report-widow-inherits-confession-36-year-old-hate.html? pagewanted=all (last visited September 6, 2016).

. Anthony V. Alfieri, Retrying Race, 101 Mich. L. Rev, 1141, 1163 (2003).

. Anders Walker, The Violent Bear It Away: Emmett Till and the Modernization of Law Enforcement in Mississippi, 46 San Diego L. Rev. 459, 492-93 (2009); see also Jack Green-berg, Brown v. Board of Education: An Axe in the Frozen Sea of Racism, 48 St. Louis U. L.J. 869, 877 (2004) (citing Jack Greenberg, Crusaders in the Courts: How a Dedicated Band of Lawyers Fought for the Civil Rights Revolution (1994)).

. Walker, 46 San Diego L. Rev. at 493.

. Paula C. Johnson, Voting Rights and Civil Rights Era Cold Cases: Section Five and the Five Cities Project, 17 Berkeley J. Afr.-Am. L. & Pol’y 377, 384 (2015).

. Id.

. Id. at 387.

. Id.

. Mitchell F. Crusto, The Supreme Court’s "New” Federalism: An Anti-Rights Agenda?, 16 Ga. St. U. L. Rev. 517, 572 (2000) (citations omitted).

. Miles Johnson, A Postman’s 1963 Walk For Justice, Cut Short On An Alabama Road, NP-R, April 14, 2013, available at http://www. npr.org^2013/08/14/211711898/a-postmans-1963-walk-for-justice-cut-short-on-an-alabama-road (last visited September 6, 2016).

. Id.

. Margaret M. Russell, Cleansing Moments and Retrospective Justice, 101 Mich. ,L. Rev. 1225, 1236 (2003).

. Donald Q. Cochran, Ghosts of Alabama: The Prosecution of Bobby Frank Cherry for the Bombing of the Sixteenth Street Baptist Church, 12 Mich, J. Race & L. 1 (2006),

. Id.

, Tim Padgett and Frank Silcora, The Legacy of Virgil Ware, Time Magazine, Sept. 22, 2003, available at http://content.time.com/ time/magazine/article/0,9171,485698,00.html (last visited September 6, 2016). ,

, Id.

. Anthony Hall, A Stand for Justice-Examining Why Stand Your Ground Laws Negatively Impact African Americans, 7 S. Region Black L. Students Ass’n L.J. 95, 112 (2013) (citation omitted).

. Id.

. William D. Henderson, Demography and Desegregation in the Cleveland Public Schools: Toward A Comprehensive Theory of Educational Failure and Success, 26 N.Y.U. Rev. L. & Soc. Change 457, 557 (2001) (citing Paul Shepard, A Martyr Remembered: 30 Years Ago, Rights Activist Bruce Klunder Died Beneath a Bulldozer Here, Plain Dealer (Cleveland), Apr. 7, 1994, at Al).

. Janis L. McDonald, Heroes or Spoilers? The Role of the Media in the Prosecutions of Unsolved Civil Rights Era Murders, 34 Ohio N.U. L. Rev. 797, 817, 826 (2008) (citation omitted).

. Id.

. Paula C. Johnson, Voting Rights and Civil Rights Era Cold Cases: Section Five and the Five Cities Project, 17 Berkeley J. Afr.-Am. L. & Pol’y 377, 384 (2015).

. Id,

. Michal R. Belknap, The Vindication of Burke Marshall: The Southern Legal System and the Anti-Civil-Rights Violence of the 1960s, 33 Emory LJ. 93, 102-03, 129, 132 (1984).

. Paula C. Johnson, Voting Rights and Civil Rights Era Cold Cases: Section Five and the Five Cities Project, 17 Berkeley J. Afr.-Am. L. & Pol’y 377, 386 (2015).

. See id. at 386-89.

. Id. at 384.

. Id.

. Id. at 384.

. Id.

. Anthony V. Alfieri, Retrying Race, 101 Mich. L. Rev. 1141, 1164 (2003).

. Id.

. David J, Krajicek, Black Man Killed. For Trying To Use Whites-Only Bathroom In Alabama In 1966 Set Off Protests That Echo Today, Daily News, May 21, 2016, available at http://www.nydailynews.com/news/national/ black-man-killed-bathroom-alabama-1966-article- 1.2645287 (last visited September 6, 2016).

. Joseph W. Gill, Mississippi Justice at Last: The Trials and Convictions of Beckwith, Bowers and ICillen, Prosecutor, July/August 2007, at 26, 28.

. Id.

. Id.

. Jams L, McDonald, Heroes or Spoilers? The Role of the Media in the Prosecutions of Unsolved Civil Rights Era Murders, 34 Ohio N.U. L. Rev. 797, 809 (2008).

. Id.

. Paula C. Johnson, Voting Rights and Civil Rights Era Cold Cases: Section Five and the Five Cities Project, 17 Berkeley J. Afr,-Am. L. & Pol’y 377, 384 (2015). ;

. Id.

. Id.

. Anders Walker, The Violent Bear It Away: Emmett Till and the Modernization of Law Enforcement in Mississippi, 46 San Diego L. Rev. 459, 499 (2009).

. Bass, J. (n.d.). The Orangeburg Massacre, available at http://www.jackbass.com/_u_the_ orangeburg_massacre u 25512. htm (last visited September 6, 2016).

. Henry J. Richardson III, From Birmingham’s Jail to Beyond the Riverside Church: Martin Luther King’s Global Authority, 59 How. L.J. 169, 171 (2015).

. Id.

. Adam Nagourney & Jeff Zeleny, Obama Formally Enters Presidential Race, New York Times, Feb. 11, 2007.

. Id.

. Chris Cillizza & Emi Kolawole, President Obama Announces Reelection Bid, Washington Post, April 4, 2011.

. David A. Fahrenthold, Obama Reelected As President, Washington Post, November 7, 2012.

. The following facts are taken from the district court opinion. Ohio Coal. for the Homeless v. Husted, No. 2:06-CV-896, 2016 WL 3166251, at *1 (S.D. Ohio June 7, 2016). As stated infra, the Majority has failed to establish that any of the district court’s factual findings are clearly erroneous. By way of reference, I incorporate all of the district court's factual findings in this dissent. I have highlighted many of those findings here; however, I direct attention in particular to the district court's finding regarding the Senate Factors, which I also incorporate herein. Husted, 2016 WL 3166251, at *24-32.

. The Service Employees International Union (“SEIU”) is also a plaintiff in this matter. SEIU joined NEOCH in initiating the original action against the Secretary in 2006.

. Clear error review also applies "to the district court’s finding that the [regulations impose] ,, a burden on' African Americans’ right to vote in Ohio.” Ohio Democratic Party v. Husted, No. 16-3561, 834 F.3d 620, 643, 2016 WL 4437605, at *17 (6th Cir. Aug. 23, 2016) (Stranch, J., dissenting) (citing OFA v. Husted, 697 F.3d 423, 431 (6th Cir. 2012) (concluding that the district court did not clearly err in finding that "early voters, who have disproportionately lower incomes and less education than election day voters,” were burdened by challenged regulation)). Here, the district court concluded that "demanding perfect, or near-perfect, adherence to the five-field requirement oil ballots imposes a significant burden for homeless voters, who are spme of society’s most vulnerable members.” *657 This conclusion should not be disturbed absent clear error.

. "[T]he- Supreme Court has also endorsed factors ("the Gingles factors”) enunciated by *660 Congress to determine whether [disparate] impact is a product of current or historical conditions of discrimination such that it violates Section 2." Veasey v. Abbott, No. 14-41127, 830 F.3d 216, 244, 2016 WL 3923868, at *17 (5th Cir. July 20, 2016); see also Michigan State A. Philip Randolph Inst. v. Johnson, No. 16-2071, 833 F.3d 656, 667, n. 2, 2016 WL 4376429, at *7, n.2 (6th Cir. Aug. 17, 2016).

. Further, the impact of SB 205 and 216 was certainly significant enough for the Ohio ■ legislature to take action, for legislators to invest the time and energy in getting the laws passed, in defending a claim in a twelve-day trial, and absorbing the time of this court on appeal. The Majority’s claim that the impact of the new legislation is insignificant is belied by reality.

. Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.”)

. The district court found that approximately 60% of the homeless persons in shelters in Columbus, Ohio are African American and approximately 70% of NEOCH's in-person homeless applicants are African American.,

. If there is an error in any of. the five fields on an absentee ballot, the Board mails a "Form 11-S,” specifying the type of error and informing the voter that the ballot will not be counted unless certain steps are taken— namely, returning the Form 11-S by a certain time.

. Notably, it is unclear what channels the homeless individuals would use to receive the Form 11-S in the mail in time to cure the defect because these individuals are often transient with no fixed address.

. While the state "need not justify its laws with 'elaborate, empirical verification,’ " Citizens for Legislative Choice v. Miller, 144 F.3d 916, 924 (6th Cir. 1998), the state does need to assert a real and "precise” interest against which the citizens’ right to vote must be weighed. See Burdick v. Takushi, 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992).